## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEPHANIE JENKINS, | Civil No. 13-1548 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| THE UNIVERSITY OF MINNESOTA, TED SWEM, *in his personal capacity* and DAVID E. ANDERSEN, *in his personal capacity*, | |
| Defendants. | |

Joseph A. Larson, **JOSEPH A. LARSON LAW FIRM PLLC**, Post Office Box 4127, Saint Paul, MN  55104; and Brent S. Schafer, **SCHAFER LAW FIRM, PA**, 991 Sibley Memorial Highway, Suite 207, Lilydale, MN  55118, for plaintiff.

Timothy Joseph Pramas, **UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL COUNSEL**, 360 McNamara Alumni Center, 200 Oak Street Southeast, Minneapolis, MN  55455, for defendant The University of Minnesota.

Ana H. Voss and Greg Brooker, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415; Thomas Edward Hayes, **LAW OFFICE OF THOMAS E. HAYES**, 161 West Wisconsin Avenue, Suite 3032, Milwaukee, WI  53203; and Thomas H. Shiah, **LAW OFFICES OF THOMAS H. SHIAH**, 247 Third Avenue South, Minneapolis, MN  55415, for defendant Ted Swem.

Ana H. Voss, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN  55415, for defendant David E. Andersen.

Plaintiff Stephanie Jenkins brings this action alleging various statutory and common law tort claims against Defendants the University of Minnesota ("the University"), Ted Swem, and David Andersen, arising out of sexual harassment that allegedly occurred while she was pursuing a Ph.D. at the University. Jenkins alleges that while she was conducting research for her Ph.D., Swem, a scientist from the United States Fish and Wildlife Service ("USFWS") involved in her research project, made repeated unwanted sexual advances toward her. Jenkins also alleges that Andersen, her adviser at the University, did nothing to remedy the situation when it was brought to his attention and created a hostile work environment, ultimately forcing her to resign from her position.

Swem moves to substitute the United States as the proper defendant for the common law tort claims brought against him by Jenkins, arguing that at the time the alleged torts were committed Swem was acting within the scope of his employment with the USFWS, an agency of the federal government. Swem also brings a motion to dismiss Jenkins' hostile work environment claim brought against him under 42 U.S.C. § 1983, arguing that he is entitled to qualified immunity. The Court will deny the motion to substitute, because it concludes that Swem was acting outside the scope of his employment as a federal employee at the time he engaged in the acts forming the basis for Jenkins' tort claims. The Court will also deny the motion to dismiss, as Jenkins' complaint adequately alleges a violation of her clearly established statutory and constitutional rights.

# BACKGROUND

## I.   JENKINS' ALLEGATIONS

In January 2011, the University accepted Jenkins into its Department of Fisheries, Wildlife and Conservation Biology to pursue a Ph.D. in Natural Resources and Science Management.   (Aff. of Joseph A. Larson, Ex. B at 1, Nov. 22, 2013, Docket No. 61; Compl. ¶ 19, June 24, 2013, Docket No. 1)[1]   In pursuing her Ph.D., Jenkins' aspiration was to focus on raptor ecology, and more specifically peregrine falcons in arctic areas within the United States, with the intent to someday work for the USFWS or United States Geological Survey in a raptor research capacity.   (Compl. ¶ 16.)   In June 2011, the University hired Jenkins as a research assistant on the Colville River Special Area Peregrine Falcon Research Project ("the Project").   (Larson Aff., Ex. B at 2.)   Defendant Andersen was the Principal Investigator on the Project and served as Jenkins' advisor for her Ph.D. work at the University.   (Compl. ¶ 23.)   Patricia Kennedy was Jenkins' co-advisor for her Ph.D. and work on the Project.   (*Id.* ¶ 24.)[2]

### A.   Survey Research Trips

In the summer of 2011, Jenkins travelled to Alaska for two seventeen-day field survey research trips along the Colville River in Alaska to conduct research on peregrine falcons.   (*Id.* ¶ 27.)   The survey area for these trips was in a remote field location in arctic

---

[1] All page number references refer to the CMECF pagination, unless otherwise noted.

[2] Kennedy was initially named as a defendant in Jenkins' complaint, but the claims against her have since been dismissed pursuant to stipulation.   (Stipulation of Dismissal, Jan. 21, 2014, Docket No. 82; Order, Jan. 24, 2014, Docket No. 85.)

Alaska almost completely uninhabited by humans. (*Id.* ¶ 28.) Defendant Swem, an employee of the USFWS and an expert on peregrine falcons, accompanied Jenkins on these research trips. (*Id.* ¶ 32.) Swem considered himself to be "a host" for Jenkins while she was conducting research in Alaska. (Decl. of Ted Swem ¶ 8, Nov. 1, 2013, Docket No. 47.)

Swem was the only person who accompanied Jenkins on the first survey trip. (Compl. ¶ 32.) Jenkins alleges that during this trip Swem made unwanted sexual advances toward her. Among other things, Jenkins alleges that Swem took a photograph of her butt as she was bending over a research nest (*id.* ¶ 36), asked several questions about Jenkins' dating life, and stated that he would like to be her ideal research partner or "pool boy" (*id.* ¶ 38). Jenkins alleges that these comments made her uncomfortable. (*Id.* ¶ 39.)

After the first survey trip concluded, Jenkins and Swem spent two weeks in Fairbanks, Alaska, analyzing the data collected during the first trip and preparing for the second. (*Id.* ¶¶ 40-41.) In Fairbanks, Jenkins stayed in an apartment provided by the University. (*Id.* ¶ 41.) During this time period Swem allegedly pursued Jenkins romantically and invited her on multiple social outings, including dinners and rappelling trips. (*Id.* ¶¶ 42-44.) After Swem invited Jenkins to go rappelling he claimed to have forgotten his rappelling gear, and took Jenkins to dinner instead. (*Id.* ¶ 44.) Jenkins also alleges that once, after the two had eaten dinner at his house, Swem turned off all of the lights, making Jenkins uncomfortable. (*Id.* ¶ 46.) Jenkins also alleges that during this two-week time period Swem continued to reference becoming Jenkins' pool boy,

admitted that he was flirting with her (*id.* ¶ 47), stated he would like to give Jenkins a horse bite (when you grab someone on the thigh and squeeze) (*id.* ¶ 48), told Jenkins he was interested in her romantically (*id.* ¶ 50), suggested they bring only one tent on the second survey trip (*id.* ¶ 51), and acknowledged that his behavior could be construed as sexual harassment due to his position as her advisor and supervisor (*id.* ¶ 52). Swem also allegedly told Jenkins that "he would not make the 'first move,'" but "she should just enter his tent if she wanted to." (*Id.* ¶ 53.) Jenkins told Swem "that his behavior made her uncomfortable, but was concerned about being too direct, as she thought it could affect her spot in the Program and her eventual career." (*Id.* ¶ 54.) She did, however, tell Swem "that she wanted their relationship to remain professional." (*Id.*)

Andersen accompanied Jenkins and Swem for the first seven days of the second survey trip. (*Id.* ¶ 56.) After Andersen left, Swem's unwanted sexual advances continued. (*Id.* ¶ 57.) For example, Jenkins alleges that Swem on several occasions asked her to explain why she was not romantically interested in him and once, when they were researching a remote nest site, described in detail to Jenkins what he thought it would be like to kiss her. (*Id.* ¶¶ 57-61, 67.) Because of their location, "Jenkins could not create physical distance from Swem." (*Id.* ¶ 58.)

## B.    Jenkins' Resignation

After the survey research trips concluded, Jenkins began the fall semester at the University. (*Id.* ¶ 69.) Jenkins learned that she and Swem would be sharing an office and was immediately uncomfortable with that prospect. (*Id.* ¶ 70.) During the fall semester,

Jenkins alleges that Swem continued to pursue her romantically and persisted with his advances. (*Id.* ¶¶ 72-73, 77.) Jenkins alleges that during this time period her "studies began to suffer and she experienced physical signs of distress, including depression, inability to focus, inability to sleep and weight loss." (*Id.* ¶ 76.) After she failed a statistics midterm, Jenkins spoke with a counselor at the University's mental health clinic about the situation with Swem. (*Id.* ¶ 78.)

At the beginning of November 2011, Jenkins approached Andersen and requested that she no longer be required to share an office with Swem, explaining about Swem's advances towards her. (*Id.* ¶ 80.) A new work space was provided for Jenkins in December 2011. (*Id.* ¶ 82.) During this time period, Andersen told Jenkins on several occasions essentially that she needed to learn how to handle working with people like Swem. (*Id.* ¶¶ 83-86.) Shortly thereafter, Andersen and Kennedy began expressing concerns about Jenkins' approach to her Ph.D and became critical of her work. (*Id.* ¶¶ 87, 103.) Additionally, Andersen and Kennedy continued to discuss portions of Jenkins' work that she would be required to do alone with Swem. (*Id.* ¶¶ 93-98.) Andersen and Kennedy allegedly refused to implement possible alternatives suggested by the Equal Opportunity Affirmative Action Office ("EOAA") at the University that would have prevented Jenkins from having to work alone with Swem. (*Id.* ¶ 99-104.) Jenkins ultimately resigned her position at the University on January 27, 2013. (*Id.* ¶ 105.)

II.     **THE EEOA'S FINDINGS**

On February 8, 2013, the EEOA released an official opinion, finding that Swem had violated the University's sexual harassment policy.  (*Id.*)  The EEOA opinion described certain admissions made by Swem during the course of the EEOA's investigation.  Specifically, the opinion noted that Swem admitted to making an inappropriate comment about the photograph he had taken of Jenkins' butt.  (Larson Aff., Ex. B at 3.)  Swem also admitted to expressing a romantic interest in Jenkins "several times."  (*Id.*)  Swem conceded that he had told Jenkins that if she ever had an interest in him she could "just sit on my lap and kiss me," did not deny the horse bite incident, and admitted that he had turned the lights off in his home while the two were listening to music.  (*Id.*)  Swem admitted to making comments that he would apply to be Jenkins' pool boy and to continuing to express a romantic interest in Swem after the second field trip.  (*Id.*, Ex. B at 4-5.)

During the course of the EEOA investigation Swem also admitted, among other things, that he had two conversations with Jenkins about kissing her, acknowledged the power differential between himself and Jenkins, discussed how his actions could be viewed as sexual harassment, called her exceptionally beautiful, and developed a romantic interest in Jenkins.  (Supplemental Aff. of Joseph A. Larson, Ex. K, Dec. 24, 2013, Docket No. 75.)  Swem also admitted that Jenkins responded negatively to his advances, that he had a crush on Jenkins, and that he continued to ask why Jenkins was not interested in a romantic relationship with him.  (*Id.*)

Additionally, in a letter written by Defendant Andersen, Andersen memorialized a conversation he had with Swem on November 29, 2011, regarding Jenkins.  (*Id.*, Ex. L.) At the meeting Swem

> provided his perspective in a general way on what transpired between he and Stephanie over the summer and this fall.  In a nutshell, he indicated that he had had a "crush" on Stephanie and made several romantic advances. He indicated that he understood that there was an asymmetry in power between he and Stephanie, especially in the circumstances this summer, and that he had expressed that to Stephanie.  He also indicated that he had gotten a variety of responses from Stephanie, and thought that they had parted at the end of the summer as friends.
>
> . . . .
>
> Ted indicated that he had made some mistakes, that he wanted to resurrect a friendship with Stephanie, and that he had told her directly at the end of the summer that he respected her decision about a romantic relationship but wanted to try and move forward professionally and in terms of a friendship.

(*Id.*, Ex. L at 2.)[3]

---

[3] Prior to the hearing on the motion to substitute, counsel for Jenkins submitted a letter to the Court requesting the opportunity to supplement the record with additional materials obtained from the University in discovery that he argued were relevant to the issues before the Court on the motion to substitute – including the scope of Swem's employment and the veracity of Jenkins' allegations.  Counsel attached an affidavit to the letter listing the documents he wished to produce.  At oral argument, the Court granted counsel permission to file the referenced materials and also requested a memorandum briefly explaining the relevance of the materials. Pursuant to the Court's order Jenkins filed a supplemental memorandum and affidavit including Exhibits F through L, and a demonstrative exhibit from oral argument.  (Supplemental Mem. in Opp'n to Mot. to Substitute, Dec. 24, 2013, Docket No. 74; Supplemental Aff. of Joseph A. Larson, Dec. 24, 2013, Docket No. 75.)  The United States objects to the Court's consideration of Exhibits K and L on the basis that the documents contain hearsay within hearsay and have not been properly authenticated.  Even if this were an appropriate basis to exclude evidence at this point in the proceedings, the Court finds that the documents – produced by the University in the course of discovery – would almost certainly be admissible at trial.  The notes taken by the EEOA and the letter written by Andersen could easily be authenticated by the authors of those statements at trial, and therefore be excepted from the rule against hearsay.  *See* Fed. R. Evid. 803(6).  Additionally, Swem's statements within those documents are not hearsay because they are his own statements offered against him by the opposing party.  Fed. R. Evid. 801(d)(2).  The

(Footnote continued on next page.)

- 8 -

### III.   SWEM'S EMPLOYMENT

Swem is the Branch Chief of Endangered Species in the Fairbanks, Alaska, Fish and Wildlife Field Office of the USFWS, and held that position during the time of the events alleged in the complaint.   (Compl. ¶ 22; Swem Decl. ¶ 2.)   As part of his employment, Swem was engaged in the Project to monitor Arctic Peregrine Falcons in Northern Alaska that was part of Jenkins' Ph.D. work.   (Swem Decl. ¶ 4.)

The Project is a collaboration between the Bureau of Land Management and the United States Geological Survey ("USGS") – Minnesota Cooperative Fish & Wildlife Research Unit, and uses Swem's peregrine falcon nesting data.   (Larson Aff., Ex. B at 2.) Pursuant to an interagency agreement, the USGS agreed to "[d]evelop a research project focused on Peregrine Falcons in the Colville River Special Area" and "[c]ollect data which will contribute to the improved management of the Colville River Special Area," while the Bureau of Land Management agreed to "[p]rovide information regarding the management needs and goals of the [Bureau] within the Colville River Special Area." (Larson Aff., Ex. C at 3.)   Andersen served as the Project manager through the USGS Minnesota Cooperative Fish and Wildlife Research Unit.   (*Id.*)   Andersen, Kennedy, and

_____

(Footnote continued.)

United States also objects to the Court's consideration of Exhibit L because it was not one of the exhibits disclosed in the letter to the Court requesting permission to file additional material. Although Exhibit L was not disclosed in the original letter provided by Jenkins' counsel, the Court will consider the material as it finds it will not prejudice the United States, as the United States explicitly contends that Exhibit L is "duplicative and do[es] not have any additional probative value beyond what is already before the Court."   (United States' Objection to Plaintiff's Untimely Evidence at 3, Dec. 31, 2013, Docket No. 76.)   Accordingly, the Court concludes that the United States has already had an opportunity to respond to the admissions contained in Exhibit L, and will consider the evidence.

Swem applied for a grant in July 2010 to fund the Project.  The grant was issued to the University and specifically allocated $28,000 to fund Swem's work at the University processing research data gathered during the summer of 2011.  (Larson Aff., Ex. A at 1.)

Swem's work on the Project was approved by his supervisors at the USFWS. (Decl. of Sarah Conn, ¶ 5, Nov. 1, 2013, Docket No. 45; Decl. of Geoffrey L. Haskett, ¶¶ 6-7, Nov. 1, 2013, Docket No. 46.)  Swem was employed as a full time employee of the USFWS during the time period referenced in Jenkins' complaint.  (Haskett Decl. ¶ 3.) Swem's supervisors indicated that his job duties at the USFWS included

> conducting research through a cooperative agreement between the FWS and other federal and state cooperators including the University of Minnesota, and working with University of Minnesota faculty, students and other collaborators on data analysis and writing pertaining to long-term raptor monitoring and research projects on the Colville River in northern Alaska.

(*Id.* ¶ 4.)  Specifically, part of Swem's duties as an employee of the USFWS included conducting the two survey trips in the summer of 2011 and spending two semesters at the University to take classes and write up his peregrine falcon data for publication.  (Conn Decl. ¶ 5; Haskett Decl. ¶¶ 5-7.)  During the time period of Jenkins' allegations, USFWS paid Swem's salary.  (Haskett Decl. ¶ 4; Swem Decl. ¶ 7.)

## IV.   PROCEDURAL HISTORY

### A.   EEOC Charge

On April 13, 2012, Jenkins brought a charge against the University through the Equal Employment Opportunity Commission ("EEOC") alleging sexual discrimination. (Compl. ¶ 114.)  The EEOC issued a Notice of Right to Sue letter.  (*Id.* ¶ 115.)

## B.     The Complaint

Jenkins filed a complaint in this Court on June 24, 2013.  In the complaint, Jenkins brings claims against Swem under 42 U.S.C. § 1983 for creating a hostile work environment in violation of the Fourteenth Amendment (Compl. ¶¶ 165-168), as well as common law tort claims for intentional infliction of emotional distress, negligent infliction of emotion distress, and assault (*id.* ¶¶ 169-189).

## C.     Certification

After Jenkins' complaint was filed, the United States Attorney for the District of Minnesota certified that "Defendant Ted Swem was acting within the scope of his employment as an employee of the United States at the time of the conduct alleged in the complaint."  (Certification, Nov. 1, 2013, Docket No. 42.)  The certification does not explain the basis for the United States Attorney's decision.  (*See id.*)

## ANALYSIS

## I.     MOTION TO SUBSTITUTE

"The Federal Employees Liability Reform and Tort Compensation Act of 1988, commonly known as the Westfall Act, accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties."   *Osborn v. Haley*, 549 U.S. 225, 229 (2007) (citing 28 U.S.C. § 2679(b)(1)).  Under the Act "an action against the United States is the only remedy for injuries caused by federal employees acting within the scope of their employment."

*Anthony v. Runyon*, 76 F.3d 210, 212-13 (8th Cir. 1996)).[4]  The purpose of the Westfall

Act is "to shield covered employees not only from liability but from suit" and to place the

"cost and effort of defending the lawsuit . . . on the Government's shoulders."  *Osborn*,

549 U.S. at 248, 252.

When a federal employee is sued, the Attorney General has the authority to certify

that the employee "was acting within the scope of his office or employment at the time of

the incident out of which the claim arose."  28 U.S.C. § 2679(d)(1).  Under the Westfall

Act's implementing regulations the United States Attorney for the district court in which

the civil action at issue is brought "is authorized to make the statutory certification that

the Federal employee was acting within the scope of his office or employment with the

Federal Government at the time of the incident out of which the suit arose."  28 C.F.R.

§ 15.4(a).

## A.     Standard of Review

Upon a motion for substitution, the statutory certification "although subject to

judicial review, is prima facie evidence that the employee's challenged conduct was

within the scope of employ."  *Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991);

*see also Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995).  A plaintiff

---

[4] An action may be maintained, however, against an individual federal employee acting in the scope of his employment where the action is "brought for a violation of the Constitution of the United States" or "brought for a violation of a statue of the United States under which such action against an individual is otherwise authorized."  28 U.S.C. § 2679(b)(2).  Because Swem seeks substitution of the United States only with respect to Jenkins' common law tort claims and not the claim brought under 42 U.S.C. § 1983, this exemption to the exclusivity of the United States as a defendant is not implicated here.

opposing the certification bears the burden of "com[ing] forward with specific facts rebutting the government's scope-of-employment certification."  *Brown*, 949 F.3d at 1012; *see also Green v. Hall*, 8 F.3d 695, 698 (9th Cir. 1993) ("The Attorney General's decision regarding scope of employment certification is conclusive unless challenged. Accordingly, the party seeking review bears the burden of presenting evidence and disproving the Attorney General's decision to grant or deny scope of employment certification by a preponderance of the evidence." (footnote and citation omitted)).  "If the court finds that the employee was acting outside of the scope of his employment, the court must refuse to substitute the United States."  *Heuton v. Anderson*, 75 F.3d 357, 360 (8th Cir. 1996).

Courts generally employ a two-part analysis when determining whether a particular defendant is covered under the Westfall Act.  *See Strei v. Blaine*, Civ. No. 12-1095, 2013 WL 6243881, at *5 (D. Minn. Dec. 3, 2013).  The first inquiry is whether the defendant is a federal employee, and – where more than one potential employer is implicated by the facts – is often determined by examining the scope of the federal employment contract.  *See id.*; *see also Murray ex rel. Murray v. United States*, 258 F. Supp. 2d 1006, 1009 (D. Minn. 2003).  If the Court concludes that the claim at issue resulted from the performance of a function under a federal employment contract the second inquiry goes on to examine whether the defendant was acting within the scope of his employment.  *Allender v. Scott*, 379 F. Supp. 2d 1206, 1211, 1218 (D.N.M. 2005).

### B.    Federal Employee

Jenkins first argues that the motion for substitution should be denied because Swem was not acting as a federal employee at the time of the alleged incidents, but rather was acting as an employee of the University during the relevant time period.  As support for this proposition, Jenkins points to the grant that funded the Project, a statement from the EEOA opinion that Swem was "on sabbatical at the University," and the interagency agreement proposing the Project, which does not mention the USFWS.  (Pl.'s Mem. in Opp'n to Mot. to Substitute at 6, 12, Nov. 22, 2013, Docket No. 59.)

The Court concludes that none of the documents relied upon by Jenkins suffice to rebut the certification that Swem was acting pursuant to his federal employment with the USFWS at the time of the alleged events.  At most, Jenkins' arguments suggest that Swem may simultaneously have been employed by both the USFWS and the University.  First, although some of the funding for the Project came from a grant issued to the University, that does not change the undisputed fact that Swem's salary was paid by the USFWS and he remained a full time employee of the agency during the entire time period at issue in the lawsuit.  For example, it is a common practice for professors and other institutional employees to receive grant money dedicated to particular projects.  That a professor at the University of Minnesota receives grant money does not, however, terminate that professor's employment relationship with the University.

Second, the statement from the EEOA opinion that Swem was on sabbatical says nothing about the status of Swem's employer-employee relationship with the USFWS.  Both of Swem's supervisors submitted affidavits indicating that his work duties for the

USFWS specifically included the trips he took with Jenkins, and also his time spent at the University in the 2011-2012 academic year.[5]

Finally, it is unclear what conclusions Jenkins attempts to draw from the fact that the interagency agreement proposing the Project does not mention the USFWS.  The interagency agreement designates work to Andersen in his role as an employee of the USGS.  Swem was then brought in to work on the Project and contribute his peregrine falcon data.  This contribution was approved by his federal employer, and cooperation with other agencies and research projects specifically constituted part of his job duties at the USFWS.  Therefore, the Court concludes that Jenkins has identified no facts or legal authority that would prevent Swem from simultaneously carrying out his responsibilities as an employee of USFWS and engaging in projects with the University, and has failed to show that he was not a federal employee during the relevant time period.  *See Beaver v. Jacuzzi Bros., Inc.*, 454 F.2d 284, 285 (8th Cir. 1972) ("As a matter of common experience and of present business practices in our economy, it is clear that an employee may be employed by more than one employer even while doing the same work.").  In other words, engaging in work pursuant to the grant and at the behest of University employees is not mutually exclusive of Swem's federal employee obligations, and in fact, was specifically within the scope of his work for the USFWS.  *See Walker v.*

---

[5] In her supplemental affidavit, Jenkins submitted additional documents that refer to Swem as being on sabbatical.  (*See* Supplemental Larson Aff., Ex. F-J.)  Because the fact that Swem may have been on sabbatical does not indicate that he was acting outside the scope of his federal employment, citation to these documents does not alter the Court's opinion that Swem was acting as a federal employee at all relevant times.

*Chugachmiut*, 46 F. App'x 421, 425 (9th Cir. 2002) (finding that plaintiff had not met her burden to rebut the United States Attorney's certification where plaintiff "merely argues that [defendant] could not have been acting pursuant to the [federal employment contract] when she was terminated because [defendant] was also a party to other [non-federal employment contracts]." [Defendant]'s involvement in other contracts does not affect its ability to act in furtherance of the [federal employment contract].").  Accordingly, the Court concludes that Swem was a federal employee during the relevant time period, and will go on to consider whether he was acting within the scope of that employment.

### C.    Scope of Employment

#### 1.    Evidentiary Standards

In this case, the United States argues, at least in part, that Swem was acting within the scope of his employment because he did not engage in the conduct alleged by Jenkins.  (Mem. in Supp. of Mot. to Substitute at 16, Nov. 1, 2013, Docket No. 44.)  The Eighth Circuit has held that the United States Attorney's scope of employment certification may be based upon its conclusion that the intentional tort alleged in a plaintiff's complaint did not take place.  *See Heuton*, 75 F.3d at 360 ("Because it is illogical to assume that Congress intended to protect guilty employees but desert innocent ones, we decline to follow the holding [of the First Circuit] that the immunity provided by the Westfall Act is available only when the defendant-employee admits engaging in the harmful conduct."); *see also Kimbro v. Velten*, 30 F.3d 1501, 1505 (D.C. Cir. 1994) ("The government, faced with an allegation of an intentional tort on the part of its

employee, if it concludes that the tort did not take place, will understandably assert that the employee was acting within his or her scope of office or employment – in order to confer immunity on the employee – and deny the tort occurred."); *Melo v. Hafer*, 13 F.3d 736, 746 (3d Cir. 1994) ("[T]he Attorney General may file a scope of employment certificate based on a finding that the defendant did not engage in the conduct alleged by the plaintiff, and . . . the court may grant substitution if the plaintiff fails to come forward with competent evidence of the alleged conduct.").   By so holding, these courts have determined that a plaintiff's allegations are not entitled to an assumption of truth when the Court is deciding the question of whether substitution is appropriate.   *See Kimbro*, 30 F.3d at 1509 ("The [First Circuit] focused on the allegations, assumed they were true, and then asked whether Congress would have intended immunity for such a defendant. We . . . think such an approach puts a premium on skillful pleading and is quite unfair to the employee defendant.   More important, it allows a plaintiff to nullify a government employee's immunity claim." (citation omitted)).

    In such cases there will often be substantial, if not complete, overlap between the scope of employment question and the merits.   For example, in *Kimbro*, the plaintiff brought a claim for assault and battery alleging that the defendant had "viciously struck" her.   *Id.* at 1502 (internal quotation marks omitted).   The district court had determined that if defendant had indeed struck plaintiff, that action would be outside the scope of her employment.   *Id.*  But defendant argued that substitution was proper because she had not engaged in the conduct.   *Id.*  Therefore, the motion for substitution presented a scenario

where determining whether defendant was acting within the scope of her employment (whether she struck plaintiff) also resolved the merits of the assault and battery claim.

Even where the scope of employment question (and thus the propriety of substitution) is coterminous with the merits of the case, it is widely recognized that whatever determination regarding the scope of employment must be made is always a question for the court, not a jury, and must "be resolved before trial, as soon after the motion for substitution as practicable, even if an evidentiary hearing is needed to resolve relevant fact disputes." *Brown*, 949 F.2d at 1012; *see Kimbro*, 30 F.3d at 1509. Therefore, where a certification has been filed the Court should proceed almost as if the motion for substitution was one for summary judgment, requiring the plaintiff to come forward with evidence to rebut the prima facie evidence of scope of employment provided by the certification. *See Maron v. United States*, 126 F.3d 317, 322 (4th Cir. 1997) (approving the district court's statement that the substitution motion "constitutes, in effect, a motion for summary judgment and challenges the plaintiff to come forward with an evidentiary showing" (internal quotation marks omitted)). If the Court finds material factual disputes regarding the scope of employment it must hold an evidentiary hearing to resolve those factual disputes. *McAdams v. Reno*, 64 F.3d 1137, 1145 (8th Cir. 1995); *see also Taboas v. Mlynczak*, 149 F.3d 576, 581 (7th Cir. 1998) ("[W]hen the motion for substitution contests the facts pled in the complaint, as in a motion for summary judgment, and the summary judgment papers reveal disputed factual issues. . . . the district court may hold an evidentiary hearing to resolve material factual disputes related to the scope of employment."). At the evidentiary hearing the district court

should decide all issues necessary to resolve the scope of employment question, regardless of whether those issues also go to the merits. *See Heuton*, 75 F.3d at 361; *Melo*, 13 F.3d at 747-48 & n.8. With these standards in mind, the Court considers whether Jenkins has demonstrated that the alleged conduct occurred, and whether it fell within Swem's scope of employment.

### 2. Swem's Conduct

"Scope of employment questions are governed by the law of the state where the alleged tortious acts took place." *Johnson v. United States*, 534 F.3d 958, 963 (8th Cir. 2008). The majority of the conduct here occurred in Alaska, but Jenkins' complaint also contains allegations that Swem continued to make unwanted advances during their time at the University. Therefore, the Court has considered both Alaska and Minnesota law – which are both similar on this issue – in resolving the scope of employment question.

In determining whether an employee has acted within the scope of his employment, Alaska courts have adopted the Second Restatement of Agency, and apply a flexible multi-factored test. *See Rosenbaum v. Burgess*, Civ. No. 06-0144, 2007 WL 623795, at *4 (D. Alaska Feb. 23, 2007); *see also Laidlaw Transit, Inc. v. Crouse ex rel. Crouse*, 53 P.3d 1093, 1098-99 (Alaska 2002) (explaining that Alaska courts "do[] not follow a rigid rule for determining when tortious conduct occurs within the scope of employment" but instead apply "a flexible, multi-factored test" using the Restatement (internal quotation marks omitted)). Under this test

(1)     Conduct of a servant is within the scope of employment if, but only if:

    (a)     it is of the kind he is employed to perform;

    (b)     it occurs substantially within the authorized time and space limits;

    (c)     it is actuated, at least in part, by a purpose to serve the master, and

    (d)     if force is intentionally used by the servant against another, the use of force is not unexpected by the master.

(2)     Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time or space limits, or too little actuated by a purpose to serve the master.

*Domke v. Alyeska Pipeline Serv. Co.*, 137 P.3d 295, 300 (Alaska 2006).  None of these factors are dispositive, and are meant to serve only as relevant considerations.  *See Doe v. Samaritan Counseling Ctr.*, 791 P.2d 344, 346 (Alaska 1990).  Minnesota's standard with respect to intentional torts considers fewer factors, requiring only that "the source of the attack is related to the duties of the employee and occurs within work related limits of time and place."  *Grozdanich v. Leisure Hills Health Ctr., Inc.*, 25 F. Supp. 2d 953, 978 (D. Minn. 1998) (alteration and internal quotation marks omitted).

With respect to claims that arise out of misconduct of a sexual nature specifically, Minnesota courts have reached different conclusions regarding scope of employment based on "whether such conduct should fairly have been foreseen from the nature of the employment and the duties relating to it."  *Marston v. Minneapolis Clinic of Psychiatry & Neurology, Ltd.*, 329 N.W.2d 306, 311 n.3 (Minn. 1982) (internal quotation marks omitted).  For example, in *P.L. v. Aubert*, 545 N.W.2d 666, 667-68 (Minn. 1996) the

Minnesota Supreme Court found that a sexual assault by a teacher upon a student was not

within the scope of employment, explaining that:

> Here we find no evidence that such relationships between teacher and student are a "well-known hazard"; thus foreseeability is absent. While it is true that teachers have power and authority over students, no expert testimony or affidavits were presented regarding the potential for abuse of such power in these situations; thus there can be no implied foreseeability.

*Id.* at 668. The court further explained that "the sexual contact by the teacher toward the

student could not be considered an 'indivisible' act directly related to her teaching duties.

. . . even though the acts were committed within work related time and place." *Id.* In

*Marston*, however, the court found that a psychologist's sexual assault of a patient was

foreseeable and therefore within the scope of employment. 329 N.W.2d at 309-11. In

*Marston* the court explained that "[t]here was testimony that sexual relations between a

psychologist and a patient is a well-known hazard and thus, to a degree, foreseeable and a

risk of employment" and noted that "the acts occurred during or shortly after regular

therapy sessions and were preceded by normal massages." *Id.* at 311. Courts have

reconciled *Aubert* and *Marston* by explaining that "in the absence of evidence – such as

the opinion of a qualified expert – that a sexual assault of the plaintiff, by the employee,

was sufficiently likely so as to put the employer on notice, Minnesota Courts will not

presume to impute liability for such conduct upon an employer, as a foreseeable risk of

employment." *Grozdanich*, 25 F. Supp. 2d at 979.

Similarly, the Alaska Supreme Court has determined that sexual assault occurring

between a therapist and a patient may be within the scope of employment. *Doe*, 791 P.2d

at 347-48. In particular, the *Doe* court determined that some sexual conduct occurring in

the context of therapy satisfied the "motivation to serve" portion of the Second Restatement of Agency. *Id.* at 348. The particular type of counseling at issue had led to transference phenomenon, causing the patient to feel dependent on the counselor. *Id.* Therefore, "while the sexual acts themselves are purely self-serving, or caused by an unjustifiable loss of control by the aggressor, they have nonetheless been precipitated by the employee's performance of assigned duties." *Id.*

Under either Minnesota or Alaska law, the Court concludes that Swem's actions – as alleged in the complaint – fell outside the scope of his employment. The United States spends much of its brief discussing the types of duties that Swem was authorized to perform (going on field trips, acting as a host to University students, etc.). Jenkins does not dispute that Swem was authorized to perform these types of tasks. Nor does Jenkins dispute that the majority of the conduct complained of occurred during the authorized time and space limits of Swem's employment. The dispute therefore hinges largely on whether the conduct was sufficiently foreseeable in Swem's line of work or motivated, at least to some degree, by a desire to serve the USFWS. The Alaska and Minnesota courts' opinions finding actions involving sexual misconduct have drawn a relatively distinct line between sexual misconduct that occurs in the context of a counseling/therapist type relationship and sexual misconduct that occurs in other types of employment relationships. Such a distinction comports with the rule adopted by many other courts that, absent some particular feature of the job that makes sexual harassment or misconduct sufficiently foreseeable or in furtherance of the employer's business "an employee's sexual harassment of another employee is not within the scope of

employment." *Smith v. Am. Express Travel Related Servs. Co.*, 876 P.2d 1166, 1171 (Ariz. Ct. App. 1994) (collecting cases).   The Court concludes that unwanted sexual advances between a research student and an advisor figure – a relationship similar to that of student and teacher – are not sufficiently foreseeable to fall within the scope of employment.   *See Aubert*, 545 N.W.2d at 667-68; *see also Davis v. River Region Health Sys.*, 903 F. Supp. 2d 424, 425 (S.D. Miss. 2012) (finding that sexual advances and offensive comments made by one surgical technologist to a coworker that was also a surgical technologist was outside the scope of employment because the conduct "was not authorized or in furtherance of River Region's business" nor was the assault "incidental" to employment as a surgical technologist (alteration and internal quotation marks omitted)); *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1194-95 (Wash. Ct. App. 2000) (finding sexual harassment not within the scope of employment where a Costco employee harassed a coworker because "[w]hatever Mr. Hathaway's reasons for his conduct, they were not job related but were solely to gratify his personal objectives or desires").   The United States suggested at oral argument that sexual harassment or assault will always be foreseeable where males and females work together in the wilderness. The Court finds, however, that such a rule would unduly expand the jurisprudence of the Alaska and Minnesota courts which hold that the sexual misconduct must have been precipitated by some aspect of the job itself, such as counseling that resulted in an emotional attachment – not the mere fact that coworkers of the opposite sex work together in secluded environments.

Furthermore, the Court concludes that Swem's conduct was not undertaken for the benefit of the USFWS.  The United States argues that it does not believe that the "scope of employment certification should be denied to Mr. Swem because Plaintiff ate dinner at his house after she borrowed his car, took a shower at his apartment, or did her laundry there." (Mem. in Supp. of Mot. to Substitute at 13.)  But this is not the conduct of which Jenkins complains.  Although the actions cited by the United States may have been part of Swem's duty to host Jenkins, the Court concludes that there was no benefit to the USFWS, and Swem was not acting on behalf of the USFWS' interests when he took a photo of her butt, expressed a romantic interest in Jenkins, asked to be her pool boy, told her she can sit on his lap and kiss him, and repeatedly questioned why she was not interested in a romantic relationship with him.  *Mandy v. Quad/Graphics, Inc.*, 49 F. Supp. 2d 1095, 1106 (E.D. Wis. 1999) ("[S]exual harassment does not fall within the scope of employment unless it was motivated by a purpose to serve the employer. Because most instances of sexual harassment are not meant to serve the employer's interests, but rather involve personal motives often antithetical to the same, the general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." (citation and internal quotation marks omitted).

Whether substitution should be allowed therefore comes down to what the evidence shows at this point and what procedure the Court is required to follow in light of that evidence.  In other words, if all of Jenkins' allegations are true, it appears clear that the allegations forming the basis of her tort claims, arise out of conduct that occurred outside of Swem's scope of employment.

The Court finds that Jenkins has demonstrated sufficient facts supporting her allegations to defeat the motion for substitution, because in the EOAA findings Swem made numerous admissions regarding his conduct.  Swem admitted to making an inappropriate comment about the photograph he had taken of Jenkins' butt.  Swem admitted to expressing a romantic interest in Jenkins "several times," discussed kissing Jenkins at least twice, conceded that he had told Jenkins if she ever had an interest in him she could "just sit on my lap and kiss me," did not deny the horse bite incident, and admitted that he had turned the lights off in his home while the two were listening to music.  (Larson Aff., Ex. B; Supplemental Larson Aff., Exs. K-L.)  Swem also admitted to making comments that he would apply to be Jenkins' pool boy and to continuing to express a romantic interest in Swem after the second field trip.  These admissions are not disputed.  Swem does state in his declaration that "I deny that I sexually harassed the Plaintiff or committed any other torts against her" (Swem Decl. ¶ 9) but that denial does not contradict any of the specific admissions of fact made in connection with the EOAA investigation and his discussion with Andersen.[6]  Accordingly, the Court concludes that

---

[6] Additionally, the Court notes that cases holding that a plaintiff's allegations are not entitled to deference in the context of a motion for substitution generally occur where the Attorney General's certification states the basis for its conclusion that the defendant was acting within the scope of his employment.  Here, the certification does not state that Swem was acting within the scope of his employment because he did not engage in the alleged conduct.  *See Melo*, 13 F.3d at 747 ("The Attorney General's certification should state the basis for his or her conclusion.  If this is done, the certification will focus the subsequent proceedings on the motion for substitution and the certification can be given prima facie effect in those proceedings that Congress intended it to have.");  *Killingsworth v. Potter*, Civ. No. 05-4271, 2006 WL 724542, at *6 (E.D. Pa. Mar. 20, 2006) ("The certification should state the basis for its conclusion.  This conclusion may be challenged by a party who comes forward with competent evidence.").  In the

(Footnote continued on next page.)

no disputed issue of fact remains that when engaging in the admitted conduct Swem was

acting outside the scope of his employment,[7] and will deny the motion for substitution.[8]

## II.    MOTION FOR JUDGMENT ON THE PLEADINGS

Swem brings a motion for judgment on the pleadings under Federal Rule of Civil

Procedure 12(c) with respect to Jenkins' hostile work environment claim brought against

him under 42 U.S.C. § 1983.  The hostile work environment claim is based on Jenkins'

allegations that Swem and Andersen,

> acting under color of state law, deprived Plaintiff with reckless and/or
> callous indifference to her federally protected rights, including but not
> limited to, rights secured by the Fourteenth Amendment of the United
> States Constitution as well as rights secured by 20 U.S.C. § 1681 *et*[] *seq.*
> and in doing so w[ere] motivated by evil intent.

(Compl. ¶ 166.)  Jenkins also alleges that Swem and Andersen "deprived Plaintiff of the

equal protection of the law when Swem harassed Plaintiff, of which Andersen . . . had

_____
(Footnote continued.)

absence of such explanation in the certification, it is unclear that the certification is entitled to
prima facie evidence that Swem was acting within the scope of his employment **because** he did
not commit the conduct alleged.  Therefore, even in the absence of Swem's extensive
admissions, it is possible that Jenkins' allegations would be entitled to some deference.

[7] At the hearing on the motion for substitution, the United States argued that the relevant
inquiry is whether Swem could be **liable** for these actions, not merely whether he committed
them.  As explained above, the relevant inquiry with respect to a motion for substitution is
whether the conduct alleged occurred within the scope of Swem's employment.  Whether the
collection of conduct to which Swem has admitted (conduct which the Court determines was
outside the scope of his employment) is sufficient to entitle Jenkins to relief on her tort claims is
not a question to be resolved at this stage of the proceedings.

[8] The United States brought a motion to dismiss the tort claims against it, contingent on
its substitution as the party defendant for Swem.  (Mot. to Dismiss, Nov. 1, 2013, Docket
No. 48.)  Because the Court has concluded that substitution is inappropriate, it will also deny the
United States' motion to dismiss.

actual notice of and deliberately failed to take effective measures to stop." (*Id.* ¶ 167.) Swem moves for judgment on the pleadings, arguing that he is entitled to qualified immunity with respect to this claim.

## A.      Standard of Review

Qualified immunity shields government officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether Swem is entitled to qualified immunity, the Court examines "(1) whether the facts alleged or shown, construed in the light most favorable to [Jenkins], establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that h[is] actions were unlawful." *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012). "A Rule 12(b)(6) dismissal based on qualified immunity is appropriate when the immunity is established on the face of the complaint." *Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005) (internal quotation marks omitted).[9]

---

[9] Although Swem's motion is for judgment on the pleadings under Rule 12(c), the same standard of review applies to motions brought under either Rule 12(c) or Rule 12(b)(6). *See Westcott v. City of Omaha*, 910 F.2d 1486, 1488 (8th Cir. 1990). The Court also notes that for purposes of this motion it has considered only the allegations in Jenkins' complaint, and not the additional materials that she has presented to the Court in connection with the motion to substitute, in order to avoid converting the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are

(Footnote continued on next page.)

### B.      Law Governing § 1983 Claims for Hostile Work Environment

"Sexual harassment by state actors violates the Fourteenth Amendment and establishes a section 1983 action." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8th Cir. 2003). "[S]ection 1983 sexual-harassment claims are treated the same as sexual-harassment claims under Title VII of the Civil Rights Act of 1964." *Williams v. Herron*, 687 F.3d 971, 978 (8th Cir. 2012).   To establish a hostile work environment sexual harassment claim, Jenkins must show that

> (1) she was a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) that it affected a term, condition, or privilege of employment; and (5) that her employer knew or should have known of the harassment and failed to take appropriate remedial action.

*Crutcher-Sanchez v. Cnty. of Dakota*, 687 F.3d 979, 985 (8th Cir. 2012) (internal quotation marks omitted).

Swem does not appear to dispute that Jenkins has sufficiently alleged that she was a member of a protected group, that she was subject to unwelcome harassment, the harassment was based on sex, and the University should have known of the harassment and failed to take appropriate remedial action.   The basis of Swem's motion to dismiss is therefore his contention that Jenkins has not alleged harassment sufficient to have affected a term, condition, or privilege of her employment.

_____
(Footnote continued.)

presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").

In determining "whether the harassment affected a term, condition, or privilege of employment" the Court "considers the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job." *Duncan v. Cnty. of Dakota, Neb.*, 687 F.3d 955, 959 (8th Cir. 2012) (internal quotation marks omitted). "Sexual harassment standards are demanding – to be actionable, conduct must be extreme and not merely rude or unpleasant." *Crutcher-Sanchez*, 687 F.3d at 986 (internal quotation marks omitted). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Wright v. Rolette Cnty.*, 417 F.3d 879, 885 (8th Cir. 2005) (internal quotation marks omitted). "In order to affect the term, condition, or privilege of employment, the harassment must be sufficiently severe or pervasive to create an objectively hostile work environment, and in addition, must be subjectively perceived by the plaintiff as abusive." *Id.* The Court "examines the totality of the circumstances to determine if the environment was sufficiently hostile." *Crutcher-Sanchez*, 687 F.3d at 986.

The Eighth Circuit has concluded that qualified immunity is appropriate where the conduct at issue is not severe or pervasive, and did not affect the plaintiff's employment. For example, in *Crutcher-Sanchez*, the court concluded that the defendant was entitled to qualified immunity because "[t]he only allegations against Wagner were that he offered [plaintiff] a box of chocolates and asked her out several times. While inappropriate, his acts do not reach the high threshold of so intimidating, offensive, or hostile that it poisoned the work environment." 687 F.3d at 988 (internal quotation marks omitted).

Similarly, in *Duncan* the plaintiff Duncan pointed to extensive evidence of defendant Herron's sexual misconduct toward other women at work.   687 F.3d at 957-58.   For example Herron had sex with several female employees, attempted to kiss and inappropriately touch other female employees, and promised a female employee an easier schedule if she would strip for him.   *Id.*   Duncan also pointed to evidence that "explicit emails, pornography, and sexual jokes were pervasive in the workplace," although she had never received such emails.   *Id.* at 958.   The court concluded that Herron was entitled to qualified immunity explaining:

> Duncan cannot show that Herron's actions amounted to actionable harm
> that affected her employment.   She chose not to apply for a promotion
> because she feared damage to her reputation [because it would insinuate she
> had done something inappropriate with Herron to get the promotion]. . . .
> Her choice **not** to apply does not prove Herron's harassment was
> objectively severe, extreme or intimidating to alter a term, condition, or
> privilege of her employment.   Although Herron's conduct was vile and
> inappropriate, it did not rise to the level of actionable hostile-work-
> environment sexual harassment **as to her**.   Herron's conduct was not
> physically threatening or humiliating to Duncan.   It did not unreasonably
> interfere with her work performance. . . . As a matter of law, Duncan did
> not show a sexually harassing hostile environment sufficiently severe or
> pervasive so as to alter the conditions of her employment, a failure that
> dooms Duncan's hostile work environment claim.

*Id.* at 960 (emphasis in original) (internal quotation marks omitted).

Swem relies on these cases to argue that Jenkins' complaint does not allege a hostile work environment claim under § 1983 because

> Jenkins' complaint does not allege objectively hostile conduct.   There are
> no allegations of slurs, graffiti, derogatory comments, or other explicit
> verbal, or physical, conduct.   Further, Jenkins does not claim that Swem
> ever touched her, or said anything sexually explicit to her.   There are no
> allegations of requests for sexual favors, or other conduct of an explicit
> sexual nature.   Jenkins' allegations of illegal harassment, against Swem, do

> not get close to reaching the high threshold of "severe or pervasive
> conduct" required to prove a sexually hostile work environment.

(Def.'s Mem. in Supp. of Mot. to Dismiss at 18, Jan. 15, 2014, Docket No. 79.)

The Court concludes, however, that Jenkins' complaint – viewing the facts in the light most favorable to Jenkins – alleges conduct that is much more severe than the plaintiffs in either *Crutcher-Sanchez* or *Duncan*. In *Crutcher-Sanchez* the only conduct shown by plaintiff was that defendant offered her a box of chocolates and asked her out several times. Here, Jenkins has alleged that during two seventeen-day research trips, during time spent in Alaska, and when she returned to the University, Swem made repeated unwanted sexual advances toward her. Swem took a picture of Jenkins' butt, asked her repeated questions about her dating life, and stated that he would like to be her ideal research partner, or "pool boy." Swem pursued Jenkins romantically by asking her out on numerous occasions, continued to reference being her pool boy, and admitted that he was flirting with her. Swem also stated he would like to give Jenkins a horse bite, told Jenkins that he was interested in her romantically, and suggested that they only bring one tent for the second trip. Swem also specifically acknowledged that his conduct could be construed as sexual harassment in light of his position as Jenkins' supervisor. Swem asked Jenkins on repeated occasions why she was not romantically interested in him. Additionally, while researching in a remote nest site, Swem describe in detail to Jenkins what he thought it would be like to kiss her. These actions were frequent, and because of the isolated location were more severe than they might have been in another setting, because Jenkins was unable to remove herself from the situation.

Furthermore, unlike the plaintiff in *Duncan*, Jenkins has sufficiently alleged that this conduct was directed at her and did, in fact, unreasonably interfere with her work performance.  Jenkins alleges that Swem's unwanted advances continued when she returned to Minnesota, and also that her studies began to suffer and she experienced physical signs of distress, including depression, inability to focus, inability to sleep and weight loss.  After Jenkins also failed a statistics midterm she spoke with a counselor at the University's mental health clinic about the situation.

The Court finds the facts alleged in Jenkins' complaint to be similar to the facts of *Wright v. Rolette County*, in which the Eighth Circuit held that conduct can be actionable sexual harassment under § 1983 even in the absence of "physical touching or a request for sexual favors."  417 F.3d at 886.  In *Wright* the court concluded that defendant was not entitled to qualified immunity where he harassed the plaintiff "in a highly sexualized way," explaining that:

> He targeted Wright and made extremely vulgar, sexual comments about her, sometimes in front of her colleagues.  Wright alleges that the harassment, which took place over a two-year period, offended and embarrassed her. . . . [Defendant's] behavior was more serious than simple teasing, and it was not sporadic nor isolated.  The effect of the harassment was so serious that Wright ultimately sought medical treatment for depression, high blood pressure, and anxiety caused by the harassment. Wright also alleges that she complained to [Defendant] and to the county and that nothing was done to stop the behavior.  These facts, if proven to be true, support a claim for sexual harassment.

*Id.*  Similarly, in *Kopman v. City of Centerville*, 871 F. Supp. 2d 875 (D.S.D. 2012), the court found that defendant was not entitled to qualified immunity where plaintiff alleged sexual harassment from June 2008 to April 2009 where defendant would make

inappropriate comments two to three times a week.  *Id.* at 887.  The comments were "blatantly directed at [plaintiff]'s body," defendant told plaintiff he would like to date her, and defendant would occasionally follow behind her and "leer at her rear end."  *Id.* This type of pervasive verbal commentary of a sexual nature is the type that Jenkins alleges in her complaint.  The Court concludes that, accepting the facts in Jenkins' complaint as true, Jenkins has adequately stated a claim that Swem violated her statutory and constitutional rights by subjecting her to a hostile work environment.  Jenkins alleges a continuing pattern of frequent, sexually inappropriate comments and conduct that poisoned and permeated her work environment and that affected her psychological well-being and her job performance.  Therefore, the Court concludes that Jenkins' complaint satisfies the first prong of the qualified immunity test – that Swem's conduct amounted to a constitutional violation.

With respect to whether that right was clearly established, the Court notes that "[t]his determination is undertaken in light of the law as it existed at the time and the 'specific context of the case, not as a broad general proposition.'"  *Young v. Selk*, 508 F.3d 868, 875 (8th Cir. 2007) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  In other words, "[i]t is not enough that a right be established in an abstract sense; rather the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Wagner v. Jones*, 664 F.3d 259, 273 (8th Cir. 2011) (internal quotation marks omitted).  Swem argues that Jenkins' right to be free from this type of harassment was not clearly established because "[e]ven though, admittedly, Swem was attracted to Jenkins, nothing he did, or said, to Jenkins, would

have been known by reasonable officials to be unlawful. He never touched her. He never said anything sexually explicit to her. He apologized for taking the picture of her clothed behind." (Def.'s Mem. in Supp. of Mot. to Dismiss at 21.) The Court concludes, however, that this is both an inaccurate characterization of Jenkins' complaint and an overly narrow view of the Eighth Circuit's jurisprudence on sexual harassment which has specifically held that touching is not required in order to constitute a constitutional violation. *See Wright*, 417 F.3d at 886. Instead, the Eighth Circuit has broadly held that "[t]he right to be free of gender discrimination is clearly established." *Id.* (internal quotation marks omitted). In *Wright*, where the conduct alleged was sexually inappropriate verbal harassment, the court concluded that "[a] reasonable officer would have known that it was illegal to subject Wright to such treatment in the workplace." *Id.* Because the facts of this case are similar to *Wright* and the complaint alleges more egregious conduct than that found in cases granting officials qualified immunity, the Court concludes that Jenkins' right was clearly established. Accordingly, the Court will deny Swem's motion to dismiss.[10]

---

[10] Several months after filing his motion to dismiss, Swem filed a motion to stay discovery in this action until the Court ruled on his motion. (First Mot. to Stay Plaintiff's Discovery, Mar. 19, 2014, Docket No. 91.) United States Magistrate Judge Jeffrey J. Keyes denied the motion, explaining that "[t]he pending motion to dismiss relates only to one Count in the Complaint. The Court is not going to stay discovery on the entirety of the claims pending that motion, and the Court is not going to phase or stay discovery based only on one claim." (Order at 1-2, Mar. 27, 2014, Docket No. 98.) Swem objected to that Order. (Appeal/Objection, Apr. 14, 2014, Docket No. 101.) Because the Court has concluded that it will deny Swem's motion to dismiss that formed the basis of his request for a stay, it will deny Swem's objections as moot.

### III.    MOTION TO SUBSTITUTE ATTORNEY

As a final matter, the Court notes that on December 6, 2013, Jennifer Frisch, who was formerly listed as counsel of record for Defendant Andersen filed a motion to withdraw as counsel.  The motion proposes that Assistant United States Attorney Ana Voss be substituted as counsel of record.  (Mot. to Substitute Counsel, Dec. 6, 2013, Docket No. 66.)  Although the Court has since allowed Jennifer Frisch to withdraw, it finds no basis to substitute Ana Voss as the attorney for Defendant Andersen, as the United States has provided no reason why it should represent Defendant Andersen, who is listed as a University employee in the complaint.  (Compl. ¶ 23.)  Counsel explained at oral argument before the Court that the substitution was based on the United States' plan to bring a motion to substitute itself for the common law tort claims brought against Andersen.  To date, no such motion has been filed.  Accordingly, the Court will deny the motion at this stage to the extent it seeks substitution of Ana Voss.

### ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant Swem's Motion to Substitute the United States of America as Defendant [Docket No. 43] is **DENIED**.

2.    Defendant Swem's Motion to Dismiss [Docket No. 48] is **DENIED**.

3.    Defendant Andersen's Motion to Substitute Counsel [Docket No. 66] is **DENIED**.

4.      Defendant Swem's Motion to Dismiss Count VI [Docket No. 78] is

**DENIED**.

5.      Defendant Swem's Appeal of the Magistrate Judge's Order [Docket

No. 101] is **DENIED as moot**.

DATED:  September 25, 2014                    _s/ John R. Tunheim_____
at Minneapolis, Minnesota.                       JOHN R. TUNHEIM
                                              United States District Judge