## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEPHANIE JENKINS, | Civil No. 13-1548 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| THE UNIVERSITY OF MINNESOTA, TED SWEM, *in his personal capacity* and DAVID E. ANDERSEN, *in his personal capacity*, | |
| Defendants. | |

Joseph A. Larson, **JOSEPH A. LARSON LAW FIRM PLLC**, Post Office Box 4127, Saint Paul, MN 55104; and Brent S. Schafer, **SCHAFER LAW FIRM, PA**, 991 Sibley Memorial Highway, Suite 207, Lilydale, MN 55118, for plaintiff.

Timothy Joseph Pramas, **UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL COUNSEL**, 360 McNamara Alumni Center, 200 Oak Street Southeast, Minneapolis, MN 55455, for defendant The University of Minnesota.

Ana H. Voss and Gregory G. Brooker, Assistant United States Attorneys, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415; and Thomas Edward Hayes, **LAW OFFICE OF THOMAS E. HAYES**, 161 West Wisconsin Avenue, Suite 3032, Milwaukee, WI 53203, for defendant Ted Swem.

Ana H. Voss, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for defendant David E. Andersen.

Plaintiff Stephanie Jenkins brings this action alleging sexual harassment and several common law tort claims against Defendants Ted Swem, Dr. David Andersen, and the University of Minnesota ("the University").   Jenkins alleges that while she was conducting research for her Ph.D. program with the University, Swem, a scientist from the United States Fish and Wildlife Service ("USFWS") collaborating with the University on Jenkins's research project, made repeated unwanted sexual advances toward her. Jenkins further alleges that when she reported this conduct to her adviser Andersen, neither Andersen nor others at the University took steps to remedy the situation.   In the face of this alleged inaction and what she believed had become a hostile work environment, Jenkins resigned from her position.

This matter is now before the Court on all three of the Defendants' separate motions for summary judgment.  Because the Court finds that Andersen did not act with deliberate indifference to Jenkins's concerns, the Court will grant Andersen's motion for summary judgment.   Because the Court finds that Swem is not entitled to qualified immunity on Jenkins's sexual harassment claim, the Court will deny Swem's motion as to Count VI.   The Court will grant in part Swem's motion as to the common law tort claims, because Jenkins has demonstrated a viable claim for assault and intentional infliction of emotional distress, but she has not made the requisite showing to maintain a claim for negligent infliction of emotional distress.  Finally, because the University faces vicarious liability for Swem's conduct – although it will have the opportunity to present an affirmative defense to Jenkins's hostile work environment claim – the Court will deny

the University's motion for summary judgment as to Jenkins's Title VII hostile work environment claim.  The Court will grant the University's motion in all other respects.

## BACKGROUND

## I.    JENKINS'S ALLEGATIONS

### A.    Research Trips

Jenkins was accepted in January 2011 to the University of Minnesota's Department of Fisheries, Wildlife and Conservation Biology to study Natural Resources and Science Management and pursue a Ph.D.  (Decl. of David E. Andersen ("Andersen Decl.") ¶¶ 23-24, Dec. 1, 2014, Docket No. 133.)  She had a particular interest in raptor ecology, and during the summer before her Ph.D. studies began, she traveled to Alaska to participate in a voluntary field survey trip for the Colville River Special Area Peregrine Falcon Research Project ("the Project").  (*Id.* ¶ 25.)  The field survey was split into two seventeen-day trips along the Colville River in Alaska; one lasting from the middle of June into early July and the other from the middle of July into early August.  (*Id.* ¶ 26.)  Defendant Swem, an employee of the USFWS was the only person accompanying Jenkins, to organize and lead the trips.  (*Id.*)

Jenkins alleges that Swem began behaving in an inappropriate sexual manner toward her on the first of these trips.  (Aff. of Joseph A. Larson ("Fourth Larson Aff."), Ex. 1 (Dep. of Stephanie Jenkins ("Jenkins Dep.")) at 34:10-35:21,[1] Mar. 2, 2015, Docket

---

[1] Unless otherwise specified, all citations refer to CM/ECF pagination, except for depositions, which will use internal pagination.

No. 174.)   She claims that at the outset of the trip, Swem would consistently make "pervasive sex jokes" and tell sexually explicit stories about his experiences on past trips. (*Id.*)   She says that these jokes made her uncomfortable, but she did not immediately respond negatively to them because she did not want to upset Swem at the beginning of a two-week trip by directly stating that she thought his jokes were inappropriate.   (*Id.* at 39:22-41:19.)   At one point during the trip, Swem used a camera meant for research purposes to take a picture of Jenkins's behind.  (*Id.* at 37:4-20; Fourth Larson Aff., Ex. 26 (Equal Opportunity and Affirmative Action Office's Opinion Letter ("EOAA Opinion") at 2-3.))  Jenkins reports having felt "fear" after this development because of her isolation with Swem in the wilderness.   (Jenkins Dep. at 37:20-38:6.)   In his deposition, Swem claims that the picture was an accident.  (Dep. of Ted Swem ("Swem Dep.") at 92:5-93:7, Dec. 1, 2014, Docket No. 154.)  He admits, however, that at the time he made comments with respect to the picture that were "flippant and disrespectful," although he does not remember exactly what he said.   (*Id.* at 95:13-15.)   Swem claims that he deleted the picture and apologized.  (*Id.* at 96:2-25.)  Jenkins claims that Swem said something to the effect that the picture "falls into a particular category of scenery on the Colville River." (Jenkins Dep. at 207:13-208:23.)  She says that Swem did not apologize for taking the photo.  (*Id.*)

During the two-week period between the research trips, Jenkins remained in Fairbanks, Alaska compiling research and preparing for the second trip.  (Andersen Decl. ¶ 29.)  While in Fairbanks, Jenkins and Swem also met for what Jenkins believed was a lunch meeting to determine the logistics of their second trip.  (Jenkins Dep. at 49:16-23.)

- 4 -

The original plan for the second trip was for Andersen to accompany Swem for the first week and for Jenkins to replace him for the second week. (*Id.* at 49:10-14.)  It became apparent to Jenkins, however, that Swem had already made the necessary arrangements for her to participate in the entire two-week trip, and the meeting became – from Jenkins's perspective – a "lunch date."  (*Id.* at 50:17-20.)  At this meeting, Jenkins alleges that Swem complimented her physical appearance and expressed interest in a romantic relationship with her.  (*Id.* at 50:22-23, 51:3-5.)  She also claims that he admitted that his advances could have been considered sexual harassment due to the circumstances of their professional relationship.  (*Id.* at 51:7-8.)  Jenkins told Swem that she was not interested in a romantic relationship with him.  (*Id.* at 51:10-19.)

Andersen was present for the first week of the second trip.  (Andersen Decl. ¶ 30.) He says that he did not observe any inappropriate behavior on Swem's part toward Jenkins during this period, and Jenkins never reported such behavior to him at that time. (*Id.*)  Jenkins alleges that Swem's inappropriate behavior resumed once Andersen left them alone for the second week.  (Jenkins Dep. at 60:1-2.)  According to Jenkins, Swem would persistently ask why she was not interested in a romantic relationship with him and continued to tell the same type of "sex jokes" that he told on the first trip.  (*Id.* at 60:2-12.)  One significant event that she notes is an instance where Swem described what he thought it would be like to kiss her while they were both on a ledge swabbing the mouths of Peregrine Falcons – a situation in which Jenkins felt she had "nowhere to go."  (*Id.* at 65:3-15.)  Jenkins also claims that Swem told her she could "come into his tent anytime" and "be well received."  (*Id.* at 62:2-4.)  She observed that Swem brought alcohol with

them on the trip and believes that he brought it in order to get her intoxicated, presumably in the hopes that she would sleep with him.  (*Id.* at 62:21-63:23.)

Throughout both trips, Jenkins alleges that Swem repeatedly articulated his desire to be Jenkins's "pool boy," which Jenkins understood to be a sexual innuendo.  (*Id.* at 44:15-46:13.)  Swem says that he intended this to be a reference to an ideal research partner for Jenkins; somebody with physical strength and the ability to do useful handiwork in the wilderness.  (Swem Dep. at 100:16-107:25.)

Swem argues that Jenkins's reluctance to directly confront him about his behavior led him to believe that his conduct was not unacceptable to her or otherwise making her uncomfortable.  (*See* Swem Dep. at 181:12-13 ("I had gotten some signals that I felt were somewhat . . . ambiguous."); EOAA Opinion at 4-5.)  Despite Swem's position that he believed his comments were acceptable to Jenkins, the Equal Employment Opportunity Act ("EEOA") office at the University of Minnesota found that Swem's conduct during the research trips in Alaska constituted a violation of the University's sexual harassment policy.  (EOAA Opinion at 5.)

### B.    After the Trips

Jenkins arrived at the University of Minnesota in September 2011.  (Jenkins Dep. at 29:18-20.)  There, she learned that she would have to share an office with Swem while she was studying for her Ph.D.  During Jenkins's time at the University of Minnesota, Swem continued to ask her out for social engagements, but the unwelcome sexual comments stopped.  (*Id.* at 11:19-12:5; 87:17-89:4; Andersen Decl. ¶ 38.)  Nonetheless,

Jenkins eventually began to study in coffee shops or libraries instead of her office in order to get separation from Swem. (Jenkins Dep. at 11:4-15.) She alleges that studying in her office with Swem present had a negative impact on her academic standing because he would make it very difficult for her to focus. (*Id.* at 86:2-10.)

On November 4, 2011, Jenkins first reported Swem's behavior to her adviser, Andersen. (*Id.* at 89:8-90:1; Andersen Decl. ¶ 37.) In this meeting, Jenkins recalls that Andersen told her he "didn't want to know the details" of Swem's behavior. (Jenkins Dep. at 91:21-92:9.) His apparent lack of interest in the details made her wonder if he understood the severity of the situation in which she believed she found herself. (*Id.* at 124:2-126:8.) The basis for her action against Andersen is his allegedly retaliatory actions after her report. (*Id.* at 266:18-267:5.) These actions include accelerating deadlines for her academic work, erroneously insisting that her work was unsatisfactory, and failing to provide a safe working environment by forcing her to work one-on-one with Swem. (*Id.* at 267:7-269:2.)

Andersen denies any insinuation that he did not take Jenkins's allegations against Swem seriously. He claims that he made a new office space arrangement available to her on the Monday following her initial report on Friday, November 4, 2011, and that Jenkins found this arrangement to be agreeable. (Andersen Decl. ¶¶ 43-44.) Andersen worked to make this new office space a viable area for Jenkins to study, including repeatedly attempting to have internet access installed. (*Id.* ¶ 50.) He also met with several University officials to ascertain how best to handle Jenkins's situation, including the Office of Human Resources and his supervisor. (*Id.* ¶¶ 47-48.) Over the course of the

following months, Andersen met with both Jenkins and Swem about the alleged harassment and encouraged them to work as professionals. (*Id.* ¶¶ 53-54, 57.) Andersen also asserts that his assessment of Jenkins's academic work was due to her genuinely poor performance and not to any retaliatory motive. He points out that she was struggling with at least one of her classes and had failed to form a dissertation committee or form a research proposal for her Ph.D. by the time of her resignation. (*Id.* ¶¶ 62-66.)

Jenkins's resignation from the University came on January 27, 2012. (Fourth Larson Aff., Ex. 37 (Jenkins's resignation letter).) The letter cited "unresolved workplace and ethical issues relating to [her] research project," but does not mention Swem or harassment. (*Id.*) A week earlier, Jenkins had approached the University's Office of Equal Opportunity and Affirmative Action ("EOAA") about Swem's conduct. Gabrielle Mead, acting on behalf of the EOAA office, met with Jenkins on January 18, 2012, (*id.*, Ex. 19 (Mead's notes from first meeting with Jenkins, dated January 18, 2012)), and opened a file on Jenkins's allegations on January 20, 2012, (*id.*, Ex. 33 (Dep. of Gabrielle Mead ("Mead Dep.")) at 82:20-23). Mead then met with Andersen on January 25, 2012, (*id.*, Ex. 14 (Mead's notes from January 25 meeting with Andersen)), and called Swem on January 27, (*id.*, Ex. 25 (Mead's notes from January 27 call with Swem)), the day Jenkins resigned. The EOAA office completed its investigation on February 7, 2012, and concluded that "[g]iven the circumstances of their work together and the impact Mr. Swem's conduct has had on her ability to work with him, EOAA finds that Mr. Swem's continued expressions of interest in Ms. Jenkins, along with other

conduct he acknowledged, crossed boundaries and violated the University's sexual harassment policy." (EOAA Opinion at 5.)

## II. PROCEDURAL HISTORY

Feeling that Andersen and other University officials had not acted quickly enough to remedy the situation with Swem, Jenkins brought a charge of sexual discrimination against the University through the Equal Employment Opportunity Commission ("EEOC") on April 13, 2012. (Compl. ¶ 114, June 24, 2013, Docket No. 1.) The EEOC issued Jenkins a Notice of Right to Sue letter. (*Id.* ¶ 115.) She filed a complaint in this Court on June 24, 2013, alleging statutory and constitutional hostile work environment and discrimination claims against Swem, Andersen, and the University. She also alleges against Swem common law tort claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and assault. (*Id.* ¶¶ 169-89). Swem moved for judgment on the pleadings on the claims brought against him on qualified immunity grounds. On September 25, 2014, this Court issued an Order denying Swem's motions. *Jenkins v. Univ. of Minn.*, 50 F. Supp. 3d 1084 (D. Minn. 2014) ("the September 25 Order"). In December 2014, Andersen, the University, and Swem all filed separate summary judgment motions on various grounds. This case is now before the Court on those motions.

## ANALYSIS

## I.    STANDARD OF REVIEW

All three Defendants separately move for summary judgment.  Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    TED SWEM

### A.    Summary Judgment as to Count VI

Count VI of Jenkins's complaint alleges a hostile work environment against Swem and Andersen.[2]  Last year, Swem moved for judgment on the pleadings as to Count VI, on the basis that his conduct was protected by qualified immunity.  The Court denied his motion.  In this Court's September 25, 2014 Order, the Court concluded that Jenkins's complaint adequately stated a hostile work environment claim and that her right was clearly established at the time of Swem's conduct.  *Jenkins*, 50 F. Supp. 3d at 1102-05. Accordingly, the Court found that Swem was not entitled to qualified immunity.  Without reference to the Court's prior Order, Swem has now moved for summary judgment on qualified immunity grounds, again arguing that he did not violate Jenkins's constitutional rights, and that even if he did, her rights were not clearly established at the time.  The Court will deny Swem's motion.

### 1.    Qualified Immunity Standard

Qualified immunity shields government officials from liability if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In determining whether to grant summary judgment on the basis of qualified immunity, the "court states the facts most favorably to the plaintiff[], discounting the [officers]'

---

[2] The complaint also alleges a hostile work environment against Patricia Kennedy.  The Court granted the parties stipulation of dismissal as to all claims against Patricia Kennedy in January 2014.  (Order for Dismissal with Prejudice, Jan. 24, 2014, Docket No. 85.)

contrary evidence." *See Small v. McCrystal*, 708 F.3d 997, 1002 (8ᵗʰ Cir. 2013).  The Court considers "(1) whether the facts alleged or shown, construed most favorably to the plaintiff[], establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Id.* at 1003.  "Qualified immunity is appropriate only if no reasonable factfinder could answer yes to both of these questions." *Nelson v. Corr. Med. Servs.*, 583 F.3d 522, 528 (8ᵗʰ Cir. 2009).

### 2.      Clearly Established Right

The Court has already determined that Jenkins's right to be free from sexual harassment by a state actor is a clearly established right.  "Sexual harassment by state actors violates the Fourteenth Amendment and establishes a section 1983 action." *Tuggle v. Mangan*, 348 F.3d 714, 720 (8ᵗʰ Cir. 2003).  The Eighth Circuit found in *Wright v. Rolette County*, 417 F.3d 879 (8ᵗʰ Cir 2005), that a plaintiff could demonstrate a clearly established right by alleging that her supervisor made highly sexual comments about her on a frequent basis, leading to the plaintiff's depression and anxiety.  *Id.* at 884-86.  In the September 25 Order, this Court explained that "[b]ecause the facts of this case are similar to *Wright* and the complaint alleges more egregious conduct than that found in cases granting officials qualified immunity, the Court concludes that Jenkins'[s] right was clearly established." *Jenkins*, 50 F. Supp. 3d at 1105.

Swem has not identified any reason that that Order was erroneous or should now be reversed.  He instead argues that a reasonable officer would not have known the conduct violated Jenkins's constitutional rights because she did not make it clear that the conduct was unwelcome.  In the absence of new binding precedent or other compelling argument that the September 25 Order should be reversed on this point, the Court will not revisit this issue.  As previously concluded, Jenkins's constitutional right was clearly established.

### 3.        Violation of Jenkins's Constitutional Right

Even though Jenkins has demonstrated that she had a clearly established constitutional right, the Court must still evaluate the second prong of the qualified immunity analysis: whether the evidence presented by the parties is such that no reasonable jury could return a verdict for Jenkins on her constitutional claim.  To establish a hostile work environment sexual harassment claim, Jenkins must show:

> (1) she was a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; (4) that it affected a term, condition, or privilege of employment; and (5) that her employer knew or should have known of the harassment and failed to take appropriate remedial action.

*Crutcher-Sanchez v. Cnty. of Dakota*, 687 F.3d 979, 985 (8th Cir. 2012) (internal quotation marks omitted); *Williams v. Herron*, 687 F.3d 971, 978 (8th Cir. 2012) ("[S]ection 1983 sexual-harassment claims are treated the same as sexual-harassment claims under Title VII of the Civil Rights Act of 1964.").

In the September 25 Order, the Court concluded that Jenkins's allegations as to Swem's conduct, if proven, would amount to a constitutional violation.  Swem does not now deny any of the conduct Jenkins alleges.  Rather, he appears to argue that his conduct does not satisfy the second and fourth *Crutcher-Sanchez* criteria.

As to the second criterion, Swem claims that he did not have "fair warning" that his actions would violate the law, *Hope v. Pelzer*, 536 U.S. 730, 739-40 (2002), because Jenkins did not make clear to Swem that his "sexual advances were unwelcome," *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 68 (1986).  "Harassing conduct is considered unwelcome if it was uninvited or offensive." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1378 (8th Cir. 1996) (internal quotation marks omitted).  Swem's contention that he did not know Jenkins found his conduct unwelcome is based on his observation that Jenkins did not complain to anyone about his conduct while they were still in Alaska.  Further, once Jenkins told Swem in Alaska that she was not interested in a romantic relationship, Swem maintains that he backed off.

The facts Swem cites are relevant when determining whether his conduct was unwelcome, but they are not decisive here.  Construing the facts in the light most favorable to Jenkins, the Court finds that there are sufficient facts indicating that Swem's conduct was uninvited and that Jenkins found it offensive.  Although Jenkins did not challenge Swem's jokes immediately, she eventually told him that she did not find his sex jokes funny.  Further, she confronted him about taking a picture of her behind, told him she did not want him to give her a "horsebite," and told him explicitly that she did not want a romantic relationship with him.  Although Swem's conduct appears to have

lessened after Jenkins told him she did not want a romantic relationship, Jenkins alleges that it did not stop. Accordingly, the Court finds that there are adequate facts from which a jury could find Swem's conduct was unwelcome and that Jenkins made that fact known.

As to the fourth *Crutcher-Sanchez* criterion, Swem argues that he was not Jenkins's "supervisor" and therefore she cannot prove that he took any action that affected a term, condition, or privilege of her employment. *Vance v. Ball State Univ.*, 133 S. Ct. 2434 (2013) ("We hold that an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim . . . ."). "To determine whether the harassment affected a term, condition, or privilege of employment, we consider 'the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job.'" *Wright*, 417 F.3d at 885 (quoting *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1026 (8th Cir. 2004)).

Applying these factors to Swem, the Court concludes that there is a remaining issue of fact as to whether Swem was able to take action that affected a term, condition, or privilege of Jenkins's employment. Jenkins's work at the University relied heavily on the Project data, and Swem concedes that he had input on how Jenkins used his falcon data in her dissertation. He also acknowledges that he "told [Jenkins] that [he] would potentially play a role with her PhD committee based on conversations with David Andersen, Patricia Kennedy, and Debbie Nigro before the student was selected." (Fourth

Larson Aff., Ex. 6 (Swem's Answers to Pl.'s Interrogs.) at 10; *see also* Swem Dep. at 111:9-20; Mead Dep. at 154:6-155:14.)  Through both control of Jenkins's dissertation data and potential role on her dissertation committee, Swem had the ability to take action that would directly affect the conditions of Jenkins's employment.  Thus, the Court concludes that irrespective of Swem's official job title, a reasonable jury could conclude that he was in a position to tangibly affect the conditions of Jenkins's employment.[3]

Further, not only is there a remaining issue of material fact as to whether Swem was a supervisor who could take tangible action against Jenkins with respect to her data and dissertation, but the frequency and severity of Swem's actions raise a genuine issue of material fact as to whether his "behavior interfere[d] with plaintiff's performance on the job."  *Duncan v. Cnty. of Dakota*, 687 F.3d 955, 959 (8th Cir. 2012) (internal quotation marks omitted).  This becomes clear when Jenkins's situation is compared to a case in which the Eighth Circuit upheld a qualified immunity determination.  In *Duncan*, the plaintiff brought a hostile work environment claim against her former employer and

---

[3] Swem further maintains that Jenkins cannot prove her harassment claim because Swem's conduct was not sufficiently "severe or pervasive" to constitute a hostile work environment.  To make this argument, he relies primarily on *McMiller v. Metro*, 738 F.3d 185 (8th Cir. 2013), in which the Eighth Circuit found no hostile work environment where a male employer kissed a female employee's face on two occasions, placed or attempted to place his arms around her on three occasions, and requested that she remove a hair from his chin.  *Id.* at 188.  The Court has already considered the argument that the alleged conduct is not sufficiently severe or pervasive to constitute actionable harassment in the September 25 Order.  *Jenkins*, 50 F. Supp. 3d at 1102-05.  Jenkins has not alleged different conduct since the Court previously examined this issue, and the Court discussed the cases cited in *McMiller* when reaching the conclusion that Swem's conduct was severe or pervasive.  Because the Court has already made a determination on this issue and neither the facts nor law have changed since that determination was made, the Court will not entertain Swem's argument that the Court should reach the opposing conclusion now.

supervisor.   She alleged that the supervisor "created an openly sexually charged environment," including pervasive explicit emails, pornography, sexual jokes, and sexual favoritism.   *Id.* at 957-58 (internal quotation marks omitted).   But Duncan never personally received such emails, and her supervisor never made inappropriate sexual advances toward her.   *Id.* at 958.   Even so, she opted not to apply for a promotion because she believed promotions were based on factors other than merit and was concerned about the reputation a promotion might create.   *Id.* at 958, 960.   The court concluded that the defendant was entitled to qualified immunity, because the defendant's conduct, while "vile and inappropriate," was not directed to Duncan.   *Id.* at 960.   The defendant's "conduct was not physically threatening or humiliating to Duncan.   It did not unreasonably interfere with her work performance." *Id.*

In contrast, Jenkins unquestionably was the target of Swem's behavior.   His conduct was exclusively directed to her, and she points to a number of ways in which his conduct interfered with her employment.   His actions made her fearful on the trips to Alaska, and when his advances continued upon returning to Minnesota, Jenkins alleges that she developed depression, loss of sleep, inability to focus, Post-Traumatic Stress Disorder, and her work began to suffer.   Andersen expressed concerns that Jenkins was not making adequate progress on her dissertation and Project work.   Jenkins was often forced to work outside the office she shared with Swem because she did not feel safe or comfortable in that environment, which distracted from her work.   Although Jenkins was a historically strong student, she ultimately sought counseling after failing a statistics midterm.   Jenkins maintains that these consequences flowed from Swem's behavior

which, unlike the defendant in *Duncan*, was directed at Jenkins with frequency and consistency.

In sum, the Court concludes that a reasonable jury could return a verdict for Jenkins on her constitutional claim.  The facts, construed most favorably to Jenkins as the Court must do in considering this motion, demonstrate a violation of a constitutional right that was clearly established at the time of the alleged misconduct.  *Small*, 708 F.3d at 1003.  Thus, Swem is not entitled to qualified immunity on Jenkins's harassment claim.

### 4.        Under Color of State Law

Even if the Court finds that Swem is not entitled to qualified immunity, Swem argues that he was not acting under color of state law because he was not employed by the University and was not acting within the scope of his employment when he engaged in the alleged conduct.  For support, Swem relies on a 1945 case stating that "[i]t is clear that under 'color' of law means under 'pretense' of law.  Thus acts of officers in the ambit of their personal pursuits are plainly excluded."  *Screws v. United States*, 325 U.S. 91, 111 (1945).  Swem argues that because this Court previously found that his conduct was not undertaken for the benefit of the USFWS, he was acting in a "personal pursuit" and thus not under color of law.

The Court does not find Swem's argument persuasive, as "*Screws* had nothing to do with § 1983."  *Ziegler v. Aukerman*, 512 F.3d 777, 782 (6th Cir. 2008).  For purposes of a § 1983 claim, the standard is that "[a]n official acts 'under color of state law' if he exercises power possessed 'by virtue of state law' or 'abuses the position given to him by

the state.'" *Morlock v. W. Cent. Educ. Dist.*, 46 F. Supp. 2d 892, 915 (D. Minn. 1999) (quoting *Roe v. Humke*, 128 F.3d 1213, 1215 (8th Cir. 1997)).  The Court finds that Swem was only able to allegedly harass Jenkins because of the collaboration between the USFWS and the University of Minnesota on the Project.  By virtue of his position with USFWS and his partnership with the University, Swem helped select Jenkins for participation in the Project and was able to make the arrangements to accompany her to the research site.  He was the only other person at the site with Jenkins when the harassment took place, and his training and experience clearly made him her superior. The University held Swem out as the experienced guide who would lead Jenkins on the research trips and oversee the Project on which she was working.  As such, Swem's actions took place while he was cloaked with authority provided to him by the University of Minnesota as a mentor and supervisor for Jenkins.  Thus, the Court concludes that Swem was acting under color of state law.  The Court will deny Swem's motion for summary judgment as to Count VI.

### B.       Summary Judgment as to Counts VII-IX

Swem also moves for summary judgment as to Counts VII, VIII, and IX, which are state law tort claims for intentional infliction of emotional distress ("IIED"), negligent infliction of emotional distress ("NIED"), and assault, respectively.  Jenkins does not make clear whether she seeks relief under Alaska or Minnesota law.  Because the actions constituting the primary harassment allegations occurred in Alaska, the Court will apply Alaska law.

### 1.     Assault

Under Alaska law, a claim of assault requires the plaintiff to show (1) that the defendants' "acts intend[ed] to cause a harmful or offensive contact with the person of another," and (2) "the latter is put in imminent apprehension of such a contact." *Merrill v. Faltin*, 430 P.2d 913, 917 (Alaska 1967).  Jenkins alleges that Swem assaulted her on at least two occasions: first, when he described at length what it would be like to kiss her when they were working in close proximity, alone, in Alaska, and second, when Swem asked Jenkins if she would like him to give her a "horsebite" while they were riding in a pickup truck, which he explained would involve squeezing her thigh with both hands. Swem does not deny that these incidents occurred.

As to the second prong required for an assault claim, Jenkins maintains that she was in imminent apprehension of the contact Swem described because both incidents took place in locations where she was unable to create any physical distance between herself and Swem.  The first incident took place when Jenkins and Swem were on a ledge swabbing the mouths of peregrine falcons, and the second occurred in a moving truck when Swem was driving.  Because Jenkins was unable to move away from Swem on these occasions, she alleges that she had a fear that he would take the actions he described.

The Court concludes that a genuine issue of material fact remains as to Swem's intent and whether Jenkins was in imminent apprehension of contact.  The evidence on both points consists of Swem's testimony against Jenkins's testimony.   Credibility

determinations of this nature are best left to a jury. *Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Johnson v. Securitas Sec. Servs. USA, Inc.*, 769 F.3d 605, 616 (8th Cir. 2014) (explaining that whether a supervisor's statement about the plaintiff was true "goes to [the supervisor]'s **credibility** – a determination that a **jury** – not judge – must make"). Therefore, the Court will deny Swem's motion for summary judgment as to Jenkins's assault claim.

### 2.     IIED

Under Alaska law,

> [t]o establish a prima facie case of [IIED], the plaintiff must prove that the defendant through extreme or outrageous conduct intentionally or recklessly caused severe emotional distress or bodily harm to another. This is a high standard to meet as liability should only be found when the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

*Blake v. Guthy-Renker, LLC*, 965 F. Supp. 2d 1076, 1086 (D. Alaska 2013) (internal quotation marks and footnotes omitted).

Swem's basis for seeking summary judgment is simply that "[n]o reasonable jury could find that Swem's conduct rose to the level required for an Intentional Infliction Of Emotional Distress claim in Alaska." (Mem. of Law in Supp. of Def. Ted Swem's Mot. for Summ. J. on Counts VII, VIII and IX ("Mem. in Supp. of Swem's Second Summ. J. Mot.") at 2, 4, Mar. 27, 2015, Docket No. 188.) As with Jenkins's assault claim, Swem

does not deny the conduct Jenkins alleges. He instead challenges whether that conduct is sufficient to trigger liability.

"The elements of a claim for IIED are: (1) the conduct is extreme and outrageous, (2) the conduct is intentional or reckless, (3) the conduct causes emotional distress, and (4) the distress is severe." *Lincoln v. Interior Reg'l Hous. Auth.*, 30 P.3d 582, 589 (Alaska 2001) (internal quotation marks omitted). Here, Jenkins alleges a multitude of actions that, when considered as a whole, could be construed by a reasonable jury to be extreme and outrageous. Jenkins alleges that Swem made "pervasive sex jokes," took a photo of her behind and told her that he liked to document the "scenery" on the Colville River, asked Jenkins repeatedly if he could be her "strong" and "attractive" "pool boy," asked Jenkins if she would like a "horsebite," described at length what he believed it would feel like to kiss her, and suggested that they take only one tent on the second research trip. He also told her stories about previous females who had accompanied him on Colville River trips, that he had seen them bathing naked in the river, and persistently encouraged Jenkins to bathe in the river as well. (Jenkins Dep. at 336:3-337:11, 346:17-349:25.) On the last night of their trip, Swem pressured Jenkins to finish a bottle of whiskey while explaining that on previous trips, he and other researchers had gotten "ridiculously drunk" and could not remember the next day what they had done the previous night. (*Id.* at 63:24-64: 15.) When Jenkins refused, Swem insisted that that was just "how it's done here." (*Id.* at 63:13-64:2.) Jenkins maintains that Swem's conduct caused her to suffer severe emotional harm in the form of depression and Post Traumatic Stress Disorder.

When considering, for the purposes of summary judgment, whether the plaintiff has made a threshold showing of severity warranting submission to a jury on an IIED claim, "the trial court should accept as true those facts most favorable to the plaintiff. Having thus afforded favorable inferences to the plaintiff's case, the court should decide whether the severity of the emotional distress and the conduct of the offending party warrant submission of the claim to the jury." *Lincoln*, 30 P.3d at 589. Given Jenkins's allegations about the harm she has suffered and the number and nature of incidents in this case, genuine issues of material fact remain as to whether Swem's conduct was sufficiently outrageous – and whether Jenkins's emotional distress was sufficiently severe – to constitute IIED. "[A]fford[ing] the plaintiff all favorable factual inferences," *Mitchell v. Anchorage Police Dep't*, No. 05-273, 2007 WL 3208545, at *7 (D. Alaska Oct. 30, 2007) (internal quotation marks omitted), the Court concludes that a reasonable jury could find in favor of Jenkins on her IIED claim. Thus, the Court will deny Swem's motion for summary judgment as to Jenkins's IIED claim.

### 3. NIED

Negligent infliction of emotional distress claims are only available in a narrow set of circumstances under Alaska law. Under Alaska law, there are only three situations in which a plaintiff may maintain an NIED claim. The first scenario is if the plaintiff suffers physical injury. *Kallstrom v. United States*, 43 P.3d 162, 165-66 (Alaska 2002) ("Generally, damages are not awarded for NIED in the absence of physical injury."); *Blake*, 965 F. Supp. 2d at 1086 ("Negligent infliction of emotional distress is a separate

claim [from IIED], for which damages are generally not awarded in the absence of physical injury." (internal quotation marks omitted)).

Second, "the Alaska Supreme Court [has] recognized a bystander's right to recover damages for NIED caused by injury to another." *Wilson v. United States*, 190 F.3d 959, 961-62 (9th Cir. 1999). To recover on a "bystander" claim, a plaintiff must demonstrate: "(1) the plaintiff [was] located near the scene of the accident, (2) the shock result[ed] from a direct emotional impact from the sensory and contemporaneous observance of the accident, and (3) a close relationship exist[ed] between the plaintiff and the victim." *Kallstrom*, 43 P.3d at 165. The bystander exception clearly does not apply in this case. Jenkins was the only person at the Project aside from Swem during the relevant period, and she alleges that **she** was the victim of Swem's conduct, not a third party with whom she had a close relationship.

Third, the final "exception is where the defendant owes the plaintiff a preexisting duty." *Wilson*, 190 F.3d at 962. This exception, too, plainly does not apply in this case. Although Swem supervised Jenkins's work on the Project, Swem did not stand "in a contractual or fiduciary relationship with" Jenkins. *Id.*

Because the second and third circumstances do not apply, Jenkins may only maintain an NIED claim by demonstrating that she suffered physical injury. She has not made such a showing. While Jenkins was within a "zone of danger" when Swem described kissing her or give her a horsebite, Jenkins has not alleged that Swem ever contacted her physically. Further, although Jenkins has described depression and difficulty sleeping, she has not made the requisite showing of a physical injury to enable

her NIED claim to proceed.   Therefore, the Court will grant Swem's motion as to Jenkins's NIED claim.

### III.   DAVID ANDERSEN

#### A.   Dropped Claims

On December 1, 2014, the United States moved to substitute itself for David Andersen on Jenkins's state law tort claims.   (Mot. to Substitute the United States of America as a Def. ("Mot. to Substitute"), Dec. 1, 2014, Docket No. 124.)   The United States then also moved to dismiss those state law tort claims – Count VII, alleging IIED, and Count VIII, alleging NIED – on sovereign immunity grounds.   (Mot. to Dismiss, Dec. 1, 2014, Docket No. 127.)   Jenkins has since indicated to the Court that she is dropping Counts VII and VIII as to Andersen.   (Letter to Dist. Judge, June 17, 2015, Docket No. 200.)   Accordingly, the Court will deny as moot the United States' motions to substitute and to dismiss claims against the United States.

#### B.   Motion for Summary Judgment

Count VI of Jenkins's complaint is the only claim remaining against Andersen. Count VI alleges the same Section 1983 claims Jenkins brings against Swem for violations of her Title IX and Fourteenth Amendment rights.   Because the Court concludes that Jenkins may not pursue a Title IX violation against Andersen in his individual capacity, and Jenkins has not shown deliberate indifference on Andersen's part with respect to her Section 1983 claim, the Court will grant Andersen's motion for summary judgment.

### 1.     Title IX Hostile Work Environment

Jenkins alleges that Andersen contributed to the creation of a hostile environment by failing to address Swem's harassment once Jenkins informed him of the problem. Jenkins maintains that, as a result, Andersen violated her Title IX rights.  Andersen seeks summary judgment on the grounds that he cannot be liable for a violation of Title IX because he is a supervisory school official being sued in his individual capacity. The Eighth Circuit has held that "[a] supervisory school official may not be sued in his individual capacity, either directly under Title IX or under § 1983 based upon a violation of Title IX."  *Cox v. Sugg*, 484 F.3d 1062, 1066 (8ᵗʰ Cir. 2007).  In 2009, the Supreme Court took the same stance, explaining that "Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a) . . . but it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009).

In response, Jenkins draws the Court's attention to another line in *Sugg*, in which the Eighth Circuit indicated that courts analyzing "§ 1983 claims of **unconstitutional** sexual harassment by a teacher at an institution that receives Title IX funding . . . [could potentially] measure the individual defendant's liability under § 1983 for alleged constitutional violations by the standards of the institution's Title IX liability . . . ." *Sugg*, 484 F.3d at 1067.  Jenkins argues that this shows the Court did contemplate holding individual school officials liable for Title IX violations.  On the contrary, the line Jenkins cites describes one way of evaluating **Section 1983** claims – not Title IX claims – by

looking to the standard for Title IX claims against **institutions** – not individual school officials.  To be sure, the quotation on which Jenkins relies supports the conclusion that individual school officials may be held liable for sexual harassment in violation of the U.S. Constitution under Section 1983, but it does not speak to individual officer liability under Title IX.

Jenkins also points to two earlier cases, *Crawford v. Davis*, 109 F.3d 1281 (8th Cir. 1997), and *Morlock*, 46 F. Supp. 2d, as support for the proposition that § 1983 may be used to redress Title IX violations.  In *Crawford*, the Eighth Circuit declared that "there is no evidence that Congress intended to foreclose the use of § 1983 to redress violations of Title IX."  109 F.3d at 1284.  Likewise, in *Morlock*, this Court found that "[a]lthough the circuit courts presently are split on this issue, *Crawford* binds courts in the Eighth Circuit to its holding that section 1983 suits based on alleged deprivations of rights secured by Title IX are permissible."  46 F. Supp. 2d at 913 (footnote omitted).

The flaw with Jenkins's argument is that both *Crawford* and *Morlock* were decided in the 1990s, a decade before the Eighth Circuit's ruling in *Sugg* and the Supreme Court's holding in *Fitzgerald*.  *Sugg* and *Fitzgerald* are not only more recent holdings on this issue, but they are both binding precedent on this Court.  The Court cannot disregard the clarification provided by the Eighth Circuit and the Supreme Court.  Therefore, the Court finds that *Sugg* and *Fitzgerald* control and that Jenkins's Title IX claim is barred as to Andersen in his individual capacity.

## 2.     Section 1983 Hostile Work Environment

Jenkins also brings a hostile work environment claim under Section 1983 for a violation of the Fourteenth Amendment.  As explained above, such a claim is available against an individual officer.  *See Sugg*, 484 F.3d at 1067.   Like Swem, Andersen argues that he is entitled to qualified immunity on Jenkins's Section 1983 claim.[4]  Jenkins may show that Andersen is not entitled to qualified immunity by proving that he "had notice of a pattern of unconstitutional acts by [Swem], that [he] showed deliberate indifference to those acts, that [he] failed to take sufficient remedial action, and that such failure proximately caused injury to [Jenkins]."  *Doe v. Flaherty*, 623 F.3d 577, 584 (8th Cir. 2010).

Andersen asserts that it is undisputed that he did not have notice of Swem's conduct until November 4, 2011, well after Swem and Jenkins had returned from Alaska. He maintains that he was not "deliberately indifferent to acts committed by [Swem] that violate [Jenkins]'s constitutional rights."  *Flaherty*, 623 F.3d at 584.   When Jenkins reported Swem's conduct to Andersen, she told Andersen that Swem's offensive behavior had stopped.  (Jenkins Dep. at 12:2-9, 87:17-89:7, 193:18-24.)   Andersen argues that, despite Jenkins's assurances the behavior had stopped, he sought assistance from the Human Resources office, obtained a new office for Jenkins away from Swem, and never required her to work alone with Swem.  These actions, he maintains, were a reasonable reaction to the situation and do not demonstrate deliberate indifference to Jenkins's rights

---

[4] The standard is the same for Andersen as it is for Swem.

and concerns.  He argues that Section 1983 is not a "general civility code," *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998), and he was not required to take additional actions to foster a positive environment.  As such, even if Jenkins had a clearly established constitutional right, Andersen contends that the facts do not establish that he violated that right through deliberate indifference.

Both parties are in agreement that the conversation between Jenkins and Andersen on November 4, 2011, was the first occasion on which Andersen became aware of Swem's alleged conduct.  Jenkins argues that Andersen was deliberately indifferent to her report of Swem's behavior and that he failed to take appropriate remedial action.  Specifically, Jenkins alleges that Andersen informed her that he did not want to know the details of Swem's conduct, waited more than a month to obtain a new office for Jenkins, waited more than a week to contact Human Resources about Jenkins's report, failed to offer Jenkins assistance with bringing a complaint to Human Resources or EOAA, and insisted that Jenkins continue to work with Swem.

The evidence presented at the summary judgment stage belies Jenkins's claims as to Andersen.  Jenkins alleges that Andersen waited over a month to obtain a new office for Jenkins, but she offered a timeline exhibit at the summary judgment motions hearing conceding that Andersen contacted Dr. Bruce Vondracek, the Assistant Leader of Fisheries at the Minnesota Cooperative Fish and Wildlife Research Unit, on November 7 about a new workspace for Jenkins.  (*See also* Andersen Decl. ¶ 43; *id.*, Ex. 8.) November 7 was a Monday, the first business day following the conversation Jenkins and Andersen had about Swem's behavior.  The new office was right across the hall from

Andersen's office and was available to Jenkins immediately. (*Id.* ¶¶ 43-44.) Jenkins informed Andersen that the new space "will work great." (*Id.* ¶ 44.) Although it is undisputed that internet access was not immediately available, the record shows that Andersen continued to work toward obtaining internet for the office, including sending several emails around Thanksgiving to sort out quotes for installing internet, which would not be covered by college funds and therefore raised a financial issue for the University for which Andersen was not responsible. (*Id.*, Ex. 10 at 3.)

Further, the week after Jenkins expressed her concerns to Andersen, he met with Dr. Patricia Kennedy, another one of Jenkins's advisers, and the following week he met with Lori Loberg in the Office of Human Resources for the College of Food, Agriculture and Natural Resource Sciences ("CFANS"). (*Id.*, Ex. 7 at 2-3.) He then called Dr. Mike Tome, his supervisor, to seek advice on how to best respond to the allegations Jenkins made. (*Id.* at 3.) Andersen had continued meetings with both Swem and Jenkins to discuss how to move forward. Based on a record replete with evidence that Andersen took quick and frequent steps to improve the situation for Jenkins and regain stability for the department, the Court finds that no jury could conclude Andersen had been deliberately indifferent to Jenkins's rights, nor that he failed to take remedial action. *Flaherty*, 623 F.3d at 584. As a result, the Court will grant Andersen's motion for summary judgment as to Jenkins's Section 1983 claim on the grounds of qualified immunity.

## IV.   THE UNIVERSITY

### A.   Dropped Claims

On June 17, 2015, Jenkins submitted a letter to the Court dropping several claims against the University.   Specifically, Jenkins voluntarily dismissed Counts II (sexual harassment under the Minnesota Human Rights Act ("MHRA")), Count IV (retaliation under MHRA), and Counts VII (IIED), VIII (NIED), and IX (assault) as against the University.   (Larson Letter at 1, June 17, 2015, Docket No. 200.)   Those claims are all barred by sovereign immunity, and Jenkins is no longer pursuing them.   The claims remaining against the University are now Counts I, III, and V.

### B.   Counts I and III: Discrimination in Violation of Title VII

Counts I and III of Jenkins's complaint allege Title VII violations by the University.   Jenkins alleges that the University participated in the creation of a hostile work environment by failing to timely address her harassment allegations with respect to Swem or, alternatively, that the University retaliated against her by increasing pressure on her to complete stages of her dissertation and constructively discharging her.   Title VII establishes a "high threshold" that must be met before a harassment claim becomes actionable.   *Duncan v. Gen. Motors Corp.,* 300 F.3d 928, 934 (8th Cir. 2002).   A claimant must prove that the alleged harassment was sufficiently severe or pervasive as to alter a term, condition, or privilege of employment.   *Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999).   To establish "severe or pervasive" harassment, the "conduct must be extreme and not merely rude or unpleasant."   *LeGrand v. Area Res. for Cmty. & Human*

*Servs.*, 394 F.3d 1098, 1101 (8th Cir. 2005).   Courts look to the totality of the circumstances to determine whether a hostile environment exists.  *Bowen v. Mo. Dep't of Social Serv.*, 311 F.3d 878, 884 (8th Cir. 2002).  This can include the severity of the acts, whether they were physically threatening or humiliating, and whether the conduct unreasonably interfered with the employee's work performance.  *Id.*

The University challenges multiple components of Jenkins's Title VII claims. First, the University maintains that Jenkins has failed to make out a prima facie case of discrimination through a hostile work environment.  The University argues that the conditions Jenkins experienced were not so intolerable as to rise to a level where a reasonable person would feel forced to resign.  Next, the University contends that Jenkins did not suffer retaliation for her harassment report.  Finally, the University also asserts that Swem was not Jenkins's supervisor and therefore could not have taken any adverse employment action against her, preventing the University's vicarious liability.

### 1.    Prima Facie Case for Hostile Work Environment

Jenkins alleges that the University is vicariously liable for Swem's sexual harassment that was so severe and pervasive that it created a hostile work environment. As with Jenkins's constitutional claim against Swem, to state a hostile work environment claim under Title VII, Jenkins must show:

> (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take appropriate remedial action.

*Portner v. CICA SA-BO, Inc.*, 357 F. Supp. 2d 1172, 1177 (D. Minn. 2005) (quoting *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 888 n.4 (8th Cir. 1998)). "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998).

In this case, the University does not dispute that Jenkins has made the requisite showing on the first three elements. The University focuses its challenge on elements four and five. As previously explained, the Court finds that a genuine issue of material fact remains as to element four – Jenkins has produced evidence that because Swem persistently targeted her with sexual advances and it significantly affected her mental health and ability to perform her job, a genuine issue of material fact remains as to whether Swem's conduct created a hostile work environment. In addition, he would potentially have been in a position to take additional actions that would affect the conditions of her employment, based on his control of the Project data and possible role on Jenkins's dissertation committee. Thus, as to the fourth element, the Court concludes that a reasonable jury could find that Swem acted in a manner that impacted the terms and conditions of Jenkins's employment for purposes of a hostile work environment analysis. Because employers have vicarious liability for "an actionable hostile environment created by a supervisor," *id.*, summary judgment is not appropriate for the University while genuine issues of material fact remain as to whether Swem's conduct affected a term or condition of Jenkins's employment.

Although a reasonable jury could find that the pervasive nature of Swem's behavior affected the conditions of Jenkins's employment, giving rise to liability for the creation of a hostile work environment, there is no evidence in this case that Swem actually took a **tangible** employment action against her.  In *Ellerth*, the Supreme Court described tangible employment actions as:

> the means by which the supervisor brings the official power of the enterprise to bear on subordinates.  A tangible employment decision requires an official act of the enterprise, a company act.  The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors.  The supervisor often must obtain the imprimatur of the enterprise and use its internal processes.

*Id.* at 762 (citation omitted).  A common trait is that "tangible employment action in most cases inflicts direct economic harm."  *Id.*

Irrespective of whether Swem's conduct, directed at Jenkins, rose to the level of an actionable hostile work environment, Jenkins does not identify any tangible employment action he took against her.  This fact has ramifications for the University's potential liability.  "When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence."  *Id.* at 765.  The University will therefore be permitted to raise an affirmative defense to liability for Swem's conduct.

An affirmative defense in this context "comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to

avoid harm otherwise." *Id.* In this case, the University had a sexual harassment policy in place, and they maintain that they took appropriate action following Jenkins's complaints to remedy the situation. Further, the University observes that Jenkins resigned one week after bringing Swem's conduct to the attention of the EOAA office, while the investigation was still ongoing, which constituted an unreasonable failure to take advantage of corrective opportunities. The University will be permitted to make these arguments to a jury. Because a genuine issue of material fact remains as to whether Swem affected the conditions of Jenkins's employment, however, for which the University may be vicariously liable, the Court will deny the University's motion for summary judgment as to the Title VII hostile work environment claim. Similarly, because a genuine issue of material fact remains as to whether the University took sufficient action to remedy the situation once Jenkins complained, the Court will allow the parties to move forward and the affirmative defense.

### 2.     Retaliation Through Increased Pressure

Alternatively, Jenkins argues that the University, through Andersen and Kennedy, retaliated against her for reporting Swem's harassment. Under Title VII, employees are protected from retaliatory actions taken by employers because of an employee's opposition to a discriminatory employment practice. 42 U.S.C. § 2000e-3. To establish a prima facie case of retaliation under Title VII, a plaintiff must show: 1) she engaged in protected activity, 2) her employer took an adverse employment action against her, and 3) a causal connection exists between the protected activity and the adverse employment

action.  *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004); *Cross v. Cleaver*, 142 F.3d 1059, 1071 (8th Cir. 1998).  Retaliation claims involve a classic Title VII burden shifting analysis: once the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a nondiscriminatory reason for the adverse employment action.  *Henthorn*, 359 F.3d at 1028.  The plaintiff must then show that this reason is pretext for a discriminatory motive.  *Id.*

The University challenges that Jenkins has not made a prima facie showing of retaliatory discrimination.  There is no dispute in this case that Jenkins engaged in protected activity by reporting Swem's alleged sexual harassment.  The University insists, though, that there was no retaliatory employment action taken against Jenkins, and even if the Court concludes that there was, there is no evidence of a causal connection between such an adverse employment action and Jenkins's decision to report Swem's behavior.  Jenkins's work assignments did not change, she was not demoted, she was not terminated, and no other tangible actions were taken against her.

Jenkins's retaliation claim alleges that Andersen and Kennedy accelerated her dissertation timeline in retaliation for reporting Swem's behavior.  Jenkins explains that "[e]vidence that gives rise to an inference of retaliatory motive on the part of the employer is sufficient to establish a causal link," and such a link may be established through "the timing of the two events."  *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006) (internal quotation marks omitted).  She maintains that "[a] pattern of adverse actions that occur just after protected activity can supply the extra quantum of evidence to satisfy the causation requirement."  *Id.*

In this case, Jenkins alleges that the pattern of adverse actions consisted of Andersen and Kennedy accelerating her dissertation timeline.  Prior to reporting Swem's conduct in November 2011, she had never received deadlines or complaints with respect to her Ph.D. progress from her advisors, but within one week after reporting Swem's conduct, she alleges that that changed.  Andersen questioned Jenkins's progress on the Project following a public presentation she gave one week after reporting Swem's actions.  By mid-December, Andersen and Kennedy told Jenkins she had less than two months to form her dissertation committee and present a complete outline of her dissertation.  Andersen also challenged Jenkins for not registering for a class when she still had time to register.

As to the accelerated timeline, the Court finds that Jenkins's allegations are not sufficient to constitute a genuine issue of material fact as to adverse action.  Even construing the facts in the light most favorable to Jenkins and finding that Andersen and Kennedy began intensifying their questions about Jenkins's progress after she reported Swem's conduct, there is no support for the proposition that they took any actual action against her.  Simply expressing concern about Jenkins's lack of progress or informing her of new deadlines is not a tangible employment action.

Further, the comments were not threats to take tangible action that remained unfulfilled.  *See Ellerth*, 524 U.S. at 754, 760-66 (allowing a Title VII retaliation claim to proceed against an employer, but allowing the employer to assert affirmative defenses, "when a supervisor creates a hostile work environment by making explicit threats to alter a subordinate's terms or conditions of employment, based on sex, but does not fulfill the

threat"). Jenkins has offered no evidence indicating that any consequence was attached to a failure to make quicker progress on her dissertation, and she does not present Andersen's comments as threats. For example, in *Ellerth*, the supervisor made comments to the employee along the lines that he "could make your life very hard or very easy at [the defendant employer]" and expressed a hesitation to promote the employee because she was not "loose enough." *Id.* at 748 (internal quotation marks omitted). Andersen's alleged comments did not carry a similar suggestion of consequence if Jenkins failed to alter her behavior. As a result, the Court finds that the allegations of an accelerated timeline do not create a genuine issue of material fact as to adverse, retaliatory action. Therefore, the Court will grant the University's motion for summary judgment to the extent it relates to a retaliation claim against the University and will not permit Jenkins to present a Title VII claim of retaliation to the jury.

### 3.    Retaliation Through Constructive Discharge

In addition to the increased time pressure retaliation claim, Jenkins maintains that she was constructively discharged by the University's failure to take timely action to address Swem's behavior, which also constitutes a retaliatory action. She explains that Swem's harassment was pervasive and that it caused her to experience depression and Post Traumatic Stress Disorder. When she finally went to Andersen because she believed Swem's advances would never stop and Andersen allegedly hesitated to take action, Jenkins felt she had no choice but to resign. Although Jenkins concedes that employees must "tolerate some delay" to enable the employer to "gauge the credibility of the

complainant and the seriousness of the situation," *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 421 (8th Cir. 2010) (internal quotation marks omitted), she argues that she endured much more than a mere "delay" because it took the University three months to respond to her allegations.

The University argues that Jenkins fails to make out a prima facie case as to constructive discharge. "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes. The inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?" *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004) (citations omitted). "To establish a claim for constructive discharge, the plaintiff must show that the employer deliberately created intolerable working conditions with the intention of forcing the plaintiff to quit." *Coffman v. Trucker Marine, L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998) (internal quotation marks and alterations omitted).

In *Coffman*, the Eighth Circuit held that "[i]f an employee quits without giving her employer a reasonable chance to work out a problem, then she has not been constructively discharged." *Id.*; *Alvarez*, 626 F.3d at 418. An employee's decision to resign cannot be based on "subjective feelings," *Allen v. Bridgestone/Firestone, Inc.*, 81 F.3d 793, 796 (8th Cir. 1996), but rather working conditions must objectively "bec[o]me so intolerable that her resignation qualified as a fitting response" and "a reasonable person in the employee's position would have felt compelled to resign," *Suders*, 542 U.S. at 134, 141. The University argues that Swem's alleged harassment of Jenkins did not

reach that level of intolerablility, and because Jenkins did not give the University a reasonable opportunity to remedy the situation before she chose to resign, she is barred from obtaining relief under Title VII for constructive discharge now.

The University also maintains that Jenkins is not entitled to relief for constructive discharge because a constructive discharge claim requires intentional conduct by the employer, which did not exist here. In other words, "the employer must have intended to force the employee to quit, or at least have reasonably foreseen the employee's resignation as a consequence of the unlawful working conditions it created." *Jackson v. Ark. Dep't of Educ., Vocational & Technical Educ. Div.*, 272 F.3d 1020, 1026 (8th Cir. 2001); *see also Alvarez*, 626 F.3d at 418 ("To prove a constructive discharge, an employee must show that the employer **deliberately** created intolerable working conditions with the intention of forcing her to quit." (emphasis added)). Negligence is insufficient to give rise to constructive discharge liability. *Engel v. Rapid City Sch. Dist.*, 506 F.3d 1118, 1127 (8th Cir. 2007).

In this case, there is no evidence that any University official created a hostile work environment with the intention that Jenkins would quit. As previously explained, the Court concludes that Jenkins has failed to demonstrate that Swem took any adverse employment action against her to create a hostile work environment. Further, Andersen and other University officials – such as Gabrielle Mead – took steps to improve the situation and screen Jenkins from Swem. Jenkins has not made any showing that any of these officials sought to force Jenkins to quit and took deliberate actions to make her working conditions intolerable in order to achieve that goal. As a result, summary

judgment is appropriate for the University on this issue.  *See Allen*, 81 F.3d at 796-97 (affirming summary judgment for employer where plaintiff "failed to raise a genuine issue of material fact" or present any evidence that the employer "intended to force his resignation").  As with Jenkins's retaliation claim, the Court will grant the University's motion for summary judgment insofar as it relates to a constructive discharge claim and will only permit Jenkins to proceed under Title VII on her hostile work environment claim.

### C.    Count V: Hostile Work Environment Under Title IX

Count V of Jenkins's complaint alleges a hostile work environment in violation of 20 U.S.C. § 1681(a) ("Title IX").  Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).  In *Gebser v. Lago Visa Independent School District*, 524 U.S. 274 (1998), the Supreme Court defined the contours of an educational agency's liability in the context of employee-student sexual harassment.  The Supreme Court rejected theories of liability premised upon either *respondeat superior* or constructive notice.  *Id.* at 285 ("[W]e conclude that it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice.").

"For a public university 'to incur liability under Title IX, it must be (1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control.'"  *Ostrander v. Duggan*, 341 F.3d 745, 750 (8th Cir. 2003) (quoting *Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001)).  In *Ostrander*, the Eighth Circuit explained:

> Although sexual harassment and sexual abuse clearly constitute discrimination under Title IX, a public university will only be liable for situations in which it exercises substantial control over both the harasser and the context in which the known harassment occurs.  Specifically, the public university's deliberate indifference must . . . make students vulnerable to such abuse, and that abuse must take place in a context subject to the [university's] control.

*Id.* (internal quotation marks and citations omitted).

The University argues that they were not deliberately indifferent to Jenkins's report of alleged harassment and indeed took steps to mitigate any impacts on Jenkins's education.  The Eighth Circuit has held that "a private plaintiff is not entitled to damages under Title IX for a teacher's sexual harassment unless an official of the grant recipient with authority to address harassment complaints had actual notice of the teacher's alleged misconduct, and the official's inadequate response amounted to deliberate indifference to the discrimination."  *Sugg*, 484 F.3d at 1067.  These are difficult claims to prove because "[d]eliberate indifference is a stringent standard of fault."  *Id.* (internal quotation marks omitted).  The University argues that it may obtain summary judgment by showing that officials responded to the harassment "complaint reasonably, in a timely manner, and in accordance with all applicable procedures."  *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 751 (2d Cir. 2003).

As explained above, Jenkins did not notify anyone at the University of Swem's conduct until November 2011, when she met with Andersen.  Jenkins agrees that she informed the University of the situation in early November 2011.  She argues, however, that Andersen and other University officials "demonstrate[d] deliberate indifference by [taking] only minor steps to address the harassment with the knowledge that such steps would be ineffective."  *Morlock*, 46 F. Supp. 2d at 910; s*ee also Doe v. Sch. Admin. Dist. No. 19*, 66 F. Supp. 2d 57, 64 (D. Me. 1999) (denying summary judgment where a principal who confronted a teacher about dating students but "never specifically confronted her with allegations of sexual relations with a student, nor did he conduct an investigation that involved speaking with any students.  A jury could find that this response was clearly unreasonable in light of known circumstances.").

The record is plainly to the contrary.  The University provided a new office space across the hall from Andersen on the Monday following Jenkins's Friday conversation with Andersen, at which she first disclosed Swem's behavior.  After that point, she was not required to work one-on-one with Swem again.  Andersen met with a representative from the Office of Human Resources and spoke with his supervisor about the situation. He then had additional meetings with Jenkins and, unlike the principal in *Doe v. School Administrative District Number 19*, spoke directly with Swem about the situation.  He also arranged to be present for meetings between Swem and Jenkins after the winter term break, as Swem did not harass Jenkins when Andersen was present.  When Jenkins first reported the conduct to the EOAA office on January 19, 2012, she spoke with Gabrielle Mead, who immediately opened an investigation into Jenkins's complaint.  They

designed an alternative work arrangement plan for Jenkins, and Mead spoke with Deb Karner, the CFANS Human Resources Director, and also interviewed both Andersen and Swem the following week.  It is difficult to know what additional steps the University would or could have taken to resolve the situation, as Jenkins resigned without warning at the end of the week Mead interviewed Andersen and Swem.

In light of the number of steps the University took to improve the situation for Jenkins – including conducting an EOAA investigation that had only been ongoing for one week at the time Jenkins resigned – the Court finds that no reasonable jury could conclude, based on the factual record developed by the parties, that the University demonstrated deliberately indifferent to her concerns.  The record indicates that the University was handling Jenkins's "complaint reasonably, in a timely manner, and in accordance with all applicable procedures" at the time she decided to resign.  *Hayut*, 352 F.3d at  751.  This is not to say that the University handled the situation perfectly or that it could not have gone even further or done more to assist Jenkins.  That fact notwithstanding, these actions are far from exhibiting deliberate indifference.  Therefore, the Court will grant the University's motion as to Jenkins's Title IX claim.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The United States' Motion to Substitute Party for David Andersen [Docket No. 124] is **DENIED as moot**.

2.      The United States' Motion to Dismiss [Docket No. 127] is **DENIED as moot**.

3.      Andersen's Motion for Summary Judgment [Docket No. 114] is **GRANTED**.  All of plaintiff's claims against David Andersen are **DISMISSED with prejudice**.

4.      The University's Motion for Summary Judgment [Docket No. 160] is **GRANTED in part** and **DENIED in part** as follows:

   a.      The University's motion is **DENIED** as to Jenkins's Title VII hostile work environment claim.

   b.      The University's motion is **GRANTED** in all other respects.

5.      Swem's Motion for Summary Judgment as to Count VI [Docket No. 185] is **DENIED**.

6.      Swem's Motion for Summary Judgment as to Counts VII, VIII, and IX [Docket No. 187] is **GRANTED in part** and **DENIED in part** as follows:

   a.      Swem's motion is **GRANTED** as to Count VIII, negligent infliction of emotional distress, and

   b.      Swem's motion is **DENIED** as to Counts VII and IX.

DATED:  September 18, 2015
at Minneapolis, Minnesota.

_____s/ John M. Tunheim_____
JOHN R. TUNHEIM
Chief Judge
United States District Court